[989 NE2d 942, 967 NYS2d 660]

In the Matter of NORMAN BEZIO, as Superintendent of Great Meadow Correctional Facility, Respondent, v LEROY DORSEY, Appellant.

Argued March 19, 2013; decided May 2, 2013

**POINTS OF COUNSEL**

*Sheila E. Shea, Mental Hygiene Legal Service*, Albany (*Shannon Stockwell* of counsel), for appellant. I. Supreme Court was

not authorized to order the forced feeding of respondent because he has capacity to make his own medical treatment decisions, and because the State did not demonstrate at trial that its interests are superior to respondent's privacy interest. (*Matter of Fosmire v Nicoleau*, 75 NY2d 218; *Rivers v Katz*, 67 NY2d 485; *Matter of Von Holden v Chapman*, 87 AD2d 66; *Turner v Safley*, 482 US 78; *In re Grand Jury Subpoena John Doe v United States*, 150 F3d 170.) II. Supreme Court deprived respondent of his due process right to a fair trial when it denied respondent's request for a continuance. (*People v McLaughlin*, 291 NY 480; *People v Snyder*, 297 NY 81; *People v McGuinness*, 11 AD2d 630, 9 NY2d 690.)

*Eric T. Schneiderman, Attorney General*, Albany (*Andrea Oser, Barbara D. Underwood* and *Martin A. Hotvet* of counsel), for respondent. I. This Court should dismiss the appeal because Leroy Dorsey failed to preserve in Supreme Court his claim that the order implicated a privacy right to make his own medical decisions, and because his asserted claim of trial error is moot and does not warrant consideration under the mootness exception. (*McMillan v State of New York*, 72 NY2d 871; *People v O'Hara*, 96 NY2d 378; *Matter of Yeshivath Shearith Hapletah v Assessor of Town of Fallsburg*, 79 NY2d 244; *Brown v City of New York*, 60 NY2d 893; *Feinberg v Saks & Co.*, 56 NY2d 206; *Matter of Garner v New York State Dept. of Correctional Servs.*, 10 NY3d 358; *Matter of Hearst Corp. v Clyne*, 50 NY2d 707; *People v Spears*, 64 NY2d 698.) II. If the Court retains the appeal, it should affirm because any right Leroy Dorsey had to refuse forced feeding was outweighed by the State's prison-related interests, and because an inmate's retained right to free speech does not include a right to use a hunger strike to communicate grievances. (*Matter of Fosmire v Nicoleau*, 75 NY2d 218; *Rivers v Katz*, 67 NY2d 485; *Matter of Rivera v Smith*, 63 NY2d 501; *Matter of Walton v New York State Dept. of Correctional Servs.*, 13 NY3d 475; *Matter of Lucas v Scully*, 71 NY2d 399; *Turner v Safley*, 482 US 78; *Washington v Harper*, 494 US 210; *Cruzan v Director, Mo. Dept. of Health*, 497 US 261; *Pabon v Wright*, 459 F3d 241; *Matter of Doe v Coughlin*, 71 NY2d 48.)

### OPINION OF THE COURT

GRAFFEO, J.

Respondent Leroy Dorsey, an inmate in the custody of the State Department of Corrections and Community Supervision (DOCCS), is a serial hunger striker. In 2010 he undertook a

month-long hunger strike, contending that he was not suicidal but had ceased eating in order to secure transfer to another DOCCS facility and bring attention to certain claims of mistreatment. The issue before us is whether Dorsey's rights were violated by a judicial order permitting the State to feed him by nasogastric tube after his health devolved to the point that his condition became life-threatening. We answer that question in the negative.

In January 2010, Leroy Dorsey first engaged in a hunger strike while incarcerated at Clinton Correctional Facility. At that time, he explained that his motive was to obtain a transfer to another facility, indicating he was not suicidal and would start eating again if transferred. DOCCS commenced a judicial proceeding seeking permission to feed Dorsey by nasogastric tube but the application was denied by Supreme Court. Dorsey apparently voluntarily resumed eating and was subsequently transferred to Great Meadow Correctional Facility where he commenced a second hunger strike in June 2010. This hunger strike ceased without DOCCS requesting judicial relief.

The incident relevant to this appeal began on October 22, 2010 when Dorsey again stopped eating solid food, asserting that his intent was to obtain another transfer to a different facility and to draw attention to alleged abusive treatment of him at Great Meadow. Dorsey's health was monitored by medical staff at the facility and he was ultimately moved to the infirmary for close observation. While housed there, Dorsey was repeatedly advised that his refusal to eat was causing potentially irreversible damage to his internal organs and, if uninterrupted, would lead to his death. He nonetheless refused to alter his behavior, ingesting only liquids in scant amounts insufficient to sustain his health. A month after this hunger strike began, when Dorsey had lost 11.6% of his body weight in only four weeks,[1] DOCCS commenced this proceeding requesting a court order permitting medical personnel to insert a nasogastric tube and take other reasonable steps necessary to provide hydration and nutrition to Dorsey.[2] In support of its application, DOCCS

---

**1.** When examined six months before he commenced the first hunger strike, Dorsey weighed 241 pounds. After the first two hunger strikes, his weight had been reduced to 164 pounds. When DOCCS sought judicial permission to intervene in November 2010, the inmate weighed 147 pounds.

**2.** In addition to permission to feed Dorsey by nasogastric tube if necessary, DOCCS requested that its medical staff be authorized to use physical

*(n. cont'd)*

relied on the analysis in *Matter of Von Holden v Chapman* (87 AD2d 66 [4th Dept 1982]), in which the Appellate Division upheld an order permitting forced feeding of a hunger striking inmate by nasogastric tube, rejecting the inmate's constitutional objections. At the ensuing hearing on the DOCCS petition, Dorsey's treating physician testified concerning the inmate's physical condition, stating that he was in imminent risk of starving to death or sustaining a fatal cardiac arrhythmia due to electrolyte and fluid imbalance unless DOCCS was permitted to intervene.[3] Represented by counsel, Dorsey opposed the application, claiming that he was not suicidal and the State had no authority to interfere with his hunger strike.

Supreme Court granted DOCCS' application, permitting DOCCS to feed Dorsey by nasogastric tube unless Dorsey voluntarily consumed a nutritional supplement along with solid food. After the order was issued, Dorsey resumed eating solid food (rendering enforcement of the force-feeding directive unnecessary), but he pursued an appeal of Supreme Court's order. Because this particular hunger strike had ceased, the Appellate Division concluded that the case was moot (91 AD3d 1051 [3d Dept 2012]). It reasoned that two issues raised on appeal—whether DOCCS had sufficiently established that Dorsey's physical condition had degenerated to the point that he faced a substantial risk of death or permanent injury and whether the

---

restraints or sedation if necessary to facilitate nutrition and hydration and to monitor Dorsey's health by drawing blood, obtaining vital signs, taking weight, conducting physical examinations or engaging in other comparable medically necessary measures to chart his progress.

**3.** Despite its conclusion that the case is moot, the dissent apparently addresses Supreme Court's finding that Dorsey's condition was grave and that he had created a substantial risk of death by cardiac arrhythmia, which necessitated intervention to ameliorate an imminent risk of death, questioning whether the DOCCS physician established that the risk of death was sufficiently imminent. It is true that the physician did not use the word "imminent," but he testified that the inmate's physical condition was "[e]xtremely poor" and stated that, if the hunger strike were permitted to proceed, the inmate was "going to do damage to his heart, his lungs, his kidneys. He's going to experience fluid and electrolyte imbalances that could place him at risk for sudden and unexpected cardiac arrhythmia and death" and that if "he continues on this path . . . [h]e will die." In any event, in this Court, although claiming that the denial of the continuance unduly restricted his ability to cross-examine the physician, Dorsey no longer contends that reversal is warranted on the rationale that the evidence was insufficient to support Supreme Court's factual determination concerning the gravity of his medical condition. We therefore have no occasion to review that finding, even assuming the issue falls within the mootness exception.

hearing court erred in denying his attorney's request for a continuance in order to secure and review the inmate's complete medical records—were sui generis to this case and were not sufficiently novel to warrant review under the exception to the mootness doctrine.[4] But the Appellate Division concluded that a core issue fell within the exception to the mootness doctrine: the inmate's claim that the State did not have the right to secure a force-feeding order because he did not intend to kill himself but only wanted to bring attention to his pleas of mistreatment and to obtain a transfer to another facility. On that question, the court ruled in favor of DOCCS on the merits, concluding that where "an inmate's refusal to eat has placed that inmate at risk of serious injury and death . . . the State's interest in protecting the health and welfare of persons in its custody outweighs an individual inmate's right to make personal choices about what nourishment to accept" (91 AD3d at 1053). We granted the inmate leave to appeal to this Court (19 NY3d 805 [2012]) and we now affirm.

## I

The threshold issue here is a jurisdictional question—whether the inmate's claim that the force-feeding order violated his constitutional right to refuse medical treatment was preserved for review. This is the primary issue that divides us from the dissent, which concludes that the Appellate Division erred in applying the exception to the mootness doctrine to decide this

---

**4.** The Appellate Division thus concluded that these issues failed to meet two of the three requirements under the exception to the mootness doctrine (see Matter of Hearst Corp. v Clyne, 50 NY2d 707, 714-715 [1980]). Paradoxically, although the dissent asserts that the entire case is moot and that it does not fall within the mootness exception, it nonetheless chastises the Appellate Division for deciding, on mootness grounds, not to address these two issues. The dissent cites no legal authority for the proposition that it was an error of law for the Appellate Division to decline to review issues that did not fall into the mootness exception while determining the one legal issue in the case that did. The court could certainly have taken a more holistic approach, viewing all of the issues as intertwined, but its decision to resolve only the pure issue of law that clearly met the standard should not be a basis for reversal. In any event, Dorsey no longer seeks review of the sufficiency of the proof supporting Supreme Court's factual determination that his life was in danger—as to that issue, any dispute about the applicability of the exception would be academic. Although the inmate continues to press the adjournment issue, we agree with the Appellate Division that this contention does not fall within the mootness exception since the law concerning this type of discretionary ruling is well-settled, nor is it so intertwined with the core legal issue as to require our review.

contention because the inmate failed to raise the issue in the hearing court. We begin with the observation that it was DOCCS—not the inmate—that initiated this proceeding. In support of its application, DOCCS relied on *Matter of Von Holden v Chapman* (87 AD2d 66 [1982], *supra*), a case in which a hunger-striking inmate objected to a force-feeding order, arguing that it violated his constitutional right to refuse medical treatment (then characterized as a "right to privacy") and to free speech. After analyzing both constitutional claims, the Appellate Division in that case upheld the order.

Prior to this litigation, *Von Holden* was the only appellate decision in this state involving an inmate hunger strike. In light of that precedent, DOCCS Directive No. 4309—which addresses the handling of inmate hunger strikes—recognized that a forced feeding order may implicate an "inmate's right of privacy and free expression." Despite the potential constitutional issues, DOCCS maintained in its petition that such an order was nonetheless warranted in this case. It was in this context that Dorsey strenuously voiced his objections, at one point contending: "[b]y . . . putting a tube in my nose, that's cruel and unusual punishment."

To be sure, in the hearing court the inmate did not reference the Due Process Clause or articulate his constitutional objections with the specificity and clarity that he did in the Appellate Division or in this Court. This was a consequence of the fact that Dorsey addressed several arguments pro se, having been assigned counsel only shortly before the hearing, which was conducted expeditiously out of concern for preservation of his health. But it was clear from his posture—indeed, it is evident from the quote above—that he viewed the insertion of a nasogastric feeding tube as an unconstitutional invasion of his bodily integrity; such an argument seems almost inherent in an inmate's opposition to a force-feeding order.

Despite the inmate's reference to the Eighth Amendment, the hearing court undoubtedly understood, given DOCCS' reliance on *Von Holden*, that this aspect of the inmate's constitutional objection was predicated on the right to avoid unwanted medical intervention. The dissent implicitly acknowledges as much since it concludes—despite its mootness determination—that the hearing court misapplied the criteria in *Rivers v Katz* (67 NY2d 485 [1986]) (dissenting op at 111-112 n 6), a seminal right to refuse treatment case, when it resolved the "involuntary

treatment" issue (dissenting op at 114 n 7). In light of the circumstances and issues raised in the hearing court, we conclude that the constitutional right to refuse medical treatment argument was presented sufficiently to satisfy the preservation rule. That being the case, we do not share the dissent's view that the Appellate Division erred in applying the exception to the mootness doctrine due to a lack of preservation (assuming it would be error for the Appellate Division to rely on the mootness exception to reach an unpreserved issue in the exercise of its interest of justice jurisdiction, as the dissent apparently concludes).

■ Moreover, because of the dearth of New York precedent concerning inmate hunger strikes, we agree with the Appellate Division that the central issue in the case falls within the exception to the mootness rule since it is novel, likely to recur and, given the exigencies involved in addressing a hunger strike, would typically evade review (*see Hearst*, 50 NY2d 707 [1980], *supra*), as occurred in this case.[5] Accordingly, the Appellate Division did not err in applying the mootness exception.

The dissent criticizes the Appellate Division for reviewing this issue given that *Von Holden* supplied existing New York appellate precedent, reasoning "[t]here was then no particularly compelling need for the immediate generation of precedent" (dissenting op at 115). Yet it recognizes that *Von Holden* was decided in 1982, predating both *Rivers v Katz* (67 NY2d 485 [1986], *supra*) and *Matter of Fosmire v Nicoleau* (75 NY2d 218 [1990])—important precedent on the right to refuse medical treatment (dissenting op at 115 n 9). This is precisely what makes the inmate's right to refuse medical treatment argument novel and open, thereby supporting review under the exception to the mootness doctrine recognized in *Hearst*.

## II

Turning to the merits, Dorsey analogizes his right to continue the hunger strike free of interference by DOCCS to the right of

---

**5.** We can conceive of few occasions when a hunger strike case would not be moot by the time it reached this Court. Either a hearing court will issue a force-feeding order that will remain in effect for a limited period of time, expeditiously ending the hunger strike and mooting the case on the order's expiration date, or it will deny DOCCS relief. If the latter occurs, the inmate will either decide to discontinue the hunger strike (mooting the case) or his actions will, unfortunately, result in serious permanent injury or death (mooting the case). These outcomes are likely to happen before the case could make its way through the Appellate Division to this Court.

a competent adult to refuse medical treatment—a prerogative this Court recognized in several of our prior cases. In support of this contention, the inmate principally relies on *Fosmire* (75 NY2d 218 [1990], *supra*) and *Rivers* (67 NY2d 485 [1986], *supra*). *Rivers* held that the right of a patient confined in a state mental hospital to refuse psychotropic drugs largely depended on whether the patient was competent to make medical decisions. However, we made clear that, even when a patient is competent, "the right to reject treatment with antipsychotic medication is not absolute and under certain circumstances may have to yield to compelling State interests," such as when "the patient presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution" (67 NY2d at 495).

In *Fosmire*, we held that a competent adult Jehovah's Witness had the right to decline blood transfusions based on the common law and statutory right of informed consent. But we noted that this right existed only "in the absence of a superior State interest" in administering the treatment (75 NY2d at 221). There, the State had argued that the transfusions were needed to save the life of the patient. The Appellate Division found that the State did not adequately prove that no other alternatives were available to achieve the same objective. We did not disturb that finding but held, in any event, that even characterizing the blood transfusions as life-saving treatment, the patient in that case had a right to decline them. We further clarified that a right to refuse medical treatment is not the equivalent of a right to commit suicide, observing that the "State will intervene to prevent suicide . . . or the self-inflicted injuries of the mentally deranged" (*id.* at 227 [citation omitted]). We reasoned that "merely declining medical care, even essential treatment, is not considered a suicidal act" (*id.*) and explained that, by permitting the patient to avoid medical intervention, we were not condoning suicide because the injuries necessitating the blood transfusions (complications arising from childbirth) "were not self-inflicted" (*id.* at 227 n 2).

This case is significantly distinguishable from both *Rivers* and *Fosmire*. In *Rivers*, the patient's condition was neither self-inflicted nor life-threatening. Thus, the State's interests in preserving life and preventing suicide were not implicated. Yet we nonetheless indicated that if the patient had presented a danger to herself or others, the medication could be administered on an emergency basis. Here, the State sought an order

permitting forced feeding because Dorsey's conduct, according to his doctor, had created a substantial risk of imminent death or serious permanent injury.

In *Fosmire*, although the refusal to undergo a blood transfusion was arguably life-threatening, the State's right to intervene to prevent suicide had not been triggered because the patient was not responsible for the injury necessitating treatment. The same cannot be said here where Dorsey, who was a relatively healthy, 241-pound adult before he began the series of hunger strikes that reduced his weight to 145 pounds, has by this conduct created a substantial risk of death or serious permanent injury. This being the case, Dorsey's repeated statements that he is "not suicidal" are not dispositive. Whatever his purported intent, by refusing to eat for a prolonged period of time despite repeated warnings concerning the imminent physiological damage that behavior was causing, Dorsey knowingly inflicted injury on himself that, if continued, would result in his death.[6] If Dorsey had slit his wrists or swallowed a bottle of contraband sleeping pills, no one would expect DOCCS to accept at face value a contemporaneous statement that he was not suicidal. The same is true here.

This case is therefore unlike our prior right to refuse medical treatment cases, nor is it comparable to the right to refuse artificial hydration and nutrition cases that have involved

---

**6.** Citing a psychiatric report indicating that Dorsey's intent in engaging in a hunger strike was to manipulate DOCCS into initiating a force-feeding petition so that he could air his grievances in court and that he was not suicidal, the dissent asserts that "[t]here was, in fact, no evidence at all that respondent was suicidal" (dissenting op at 111 n 5). Perhaps our disagreement with the dissent is a matter of semantics—we certainly do not dispute that the inmate told the psychiatrist, his treating physician and the hearing court that he was not suicidal and had commenced the hunger strike to bring attention to certain complaints. We rely not on what the inmate declared but what he did. There was ample evidence in the record that he had put his life in serious jeopardy by knowingly and voluntarily engaging in a course of conduct that, if uninterrupted, would inevitably lead to his death. It may well be that Dorsey did not want to die—he may have believed he could starve himself to the brink of death and then end the hunger strike just in time to avert irreversible organ damage or sudden fatal cardiac arrhythmia. But once his condition progressed to the point that he created a serious risk of death (whether intentionally or recklessly), the State could fairly interpret his *actions* as suicidal in nature. Moreover, the rule we articulate today will govern DOCCS' ability to seek judicial intervention in future inmate hunger strike situations where the question of intent may be even murkier than it is here. If the central aim is the preservation of life, the inmate's medical condition should govern whether a petition is filed—not the inmate's statements concerning his or her intent.

terminally-ill patients or those in an irreversible incapacitated condition as a result of illnesses or injuries beyond their control (*see Matter of Westchester County Med. Ctr. [O'Connor]*, 72 NY2d 517 [1988]; *Cruzan v Director, Mo. Dept. of Health*, 497 US 261 [1990]). In those circumstances, unlike this one, the patients were suffering from dire medical conditions that were not of their own making and that prevented them from eating and drinking of their own accord (*O'Connor*, 72 NY2d at 524; *Cruzan*, 497 US at 266 n 1). It was the underlying illness or injury that created the need for artificial hydration and nutrition as a form of life-sustaining medical treatment. This is readily contrasted with Dorsey's situation since he was a healthy adult who was able to eat when he began the hunger strikes; his decision not to feed himself created both the life-threatening physical condition and the need for medical intervention, making the State's interest in preventing suicide a central concern. Given that the State has long made a constitutionally-permissible distinction between a right to refuse medical treatment and a right to commit suicide (or receive assistance in doing so) (*see Vacco v Quill*, 521 US 793 [1997]), the efficacy of the constitutional right on which Dorsey relies—no matter how it is characterized—is, at the very least, unclear (*see Von Holden*, 87 AD2d at 70 [noting, in an inmate hunger strike case, that "(e)ven superficial comparison of the right to decline medical treatment with the right to take one's life illustrates their essential dissimilarity and to argue that because the State has recognized the former it must permit the latter would be to engage in the most specious reasoning"]; *see also Quill*, 521 US at 803 n 7 [citing New York cases for the proposition that New York courts "recognize a right to refuse treatment, and nowhere equate the exercise of this right with suicide"]).

In any event, Dorsey is a prisoner in the custody of the state correctional system. Even assuming the constitutional right he asserts exists, and that DOCCS intervention therefore results in the curtailment of such a right, we analyze the propriety of DOCCS action under the test established in *Turner v Safley* (482 US 78 [1987]; *see Washington v Harper*, 494 US 210 [1990]). Under that standard, "when a policy or regulation impinges on a prisoner's constitutional rights, the action is valid if it is reasonably related to legitimate penological interests" (*Matter of Walton v New York State Dept. of Correctional Servs.*, 13 NY3d 475, 491 [2009] [internal quotation marks and citation omitted]; *see Matter of Doe v Coughlin*, 71

NY2d 48 [1987], *cert denied* 488 US 879 [1988]; *Matter of Lucas v Scully*, 71 NY2d 399 [1988]). This approach requires that we consider a number of factors, including the extent to which the right asserted by the inmate is compatible with incarceration; whether the challenged prison action or policy is consistent with the institutional interests that are cited to justify it; whether other means are available to the inmate to exercise the right in question; whether accommodation of the inmate's asserted right will adversely impact the prison population, employees or the allocation of prison resources; and whether, viewed in a pragmatic light, it is feasible for prison authorities to address their institutional concerns through other means.

■ Applying this test, the order permitting DOCCS to intervene to prevent Dorsey's death by feeding via nasogastric tube, if necessary, withstands scrutiny. As a preliminary matter, Dorsey contends that reversal is warranted because DOCCS failed to offer adequate testimony concerning the institutional interests justifying intervention. We disagree. At the hearing, DOCCS attempted to submit specific testimony concerning the impact of an inmate hunger strike on other prisoners and staff within a correctional facility but Dorsey's attorney objected, contending that the evidence was irrelevant, and the objection was sustained, resulting in its preclusion. Dorsey may not now argue that reversal is required based on the absence of proof he himself succeeded in keeping out of the record.

Nor was it necessary for DOCCS to offer specific testimony relating to many of the institutional interests on which it relied because they are not unique to this particular inmate hunger strike and are either embodied in statutes reflecting the public policy of the State or judicial decisions. For example, DOCCS asserts—and neither Dorsey nor the dissent dispute—that the State has a significant interest in preserving life and preventing suicidal acts (*Quill*, 521 US at 808). That interest is especially strong when the individual whose life is endangered is an inmate in DOCCS' custody. Not only does DOCCS have a statutory obligation and constitutional duty under the Eighth Amendment to safeguard the lives of individuals housed in its correctional institutions (Correction Law § 70 [2]; *see generally Estelle v Gamble*, 429 US 97 [1976]), but it can, in some circumstances, be held liable if it fails to prevent a reasonably foreseeable inmate suicide (*see Gordon v City of New York*, 70 NY2d 839, 840 [1987] ["When prison authorities know or should know that a prisoner has suicidal tendencies or that a prisoner

might physically harm himself, a duty arises to provide reasonable care to assure that such harm does not occur"]; *see generally Freeman v Berge*, 441 F3d 543, 547 [7th Cir 2006], *cert denied* 549 US 824 [2006] ["Reckless indifference to the risk of a prisoner's committing suicide is a standard basis for a federal civil rights suit"]). "The idea behind liability in such cases is that incarceration can place a person under unusual psychological strain and the jail or prison under a commensurate duty to prevent the prisoner from giving way to the strain" (*Freeman*, 441 F3d at 547).

Moreover, there is virtually universal recognition among appellate courts that an inmate hunger strike can have a significant destabilizing impact on the institution (*see Commissioner of Corr. v Coleman*, 303 Conn 800, 38 A3d 84 [2012], *cert denied* 568 US —, 133 S Ct 1593 [2013] [and cases discussed therein]). This is evident from *Matter of Von Holden v Chapman* (87 AD2d 66 [1982], *supra*), the primary case DOCCS relied on in the hearing court. *Von Holden* involved a hunger strike by Mark David Chapman, the man convicted of murdering John Lennon. There, in rejecting a similar constitutional challenge to the issuance of a forced feeding order, the Appellate Division noted that Chapman's hunger strike had caused disruption in the prison where he was housed, resentment among other inmates and had even led to copycat incidents in which others "adopt[ed] the starvation technique in order to gain attention" (87 AD3d at 67). As other courts have recognized, if one inmate is permitted to engage in this type of behavior without state interference, others "would almost certainly copy the same tactic, manipulating the system to get a change of conditions, possibly resulting in their death" (*see e.g. Commonwealth of Penn., Dept. of Pub. Welfare v Kallinger*, 134 Pa Commw 415, 422, 580 A2d 887, 891 [1990], *appeal dismissed* 532 Pa 292, 615 A2d 730 [1992]). Dorsey makes much of the fact that no such effects were established in the trial court—a point echoed by the dissent. But DOCCS was not required to wait until Dorsey's behavior actually caused disruption before it sought to intervene. It could rely on *Von Holden* and other authorities to show that, if allowed to continue, a hunger strike can have negative consequences that extend beyond the individual inmate involved.

This has been well-recognized by courts across the country who have addressed similar disputes. Incarceration places a significant psychological strain on its inhabitants, making a prison a volatile environment. This has led one federal appellate court

to observe that "prisons are like powder kegs where even the slightest disturbance can have explosive consequences" (*United States v Johnson*, 616 F3d 85, 94 [2d Cir 2010], *cert denied* 564 US —, 113 S Ct 2858 [2011]). The suicide of an inmate has an agitating effect on other prisoners (*Freeman*, 441 F3d at 547). As the Supreme Court of Connecticut explained:

> "the death of an inmate, particularly a successful suicide, evokes a strong reaction from the other inmates and creates a serious safety and security concern because the other inmates may believe that the department staff contributed to, or did not do enough to prevent the inmate's death" (*Coleman*, 303 Conn at 827, 38 A3d at 102).

That risk is particularly acute in a case like this where the inmate asserted that he was not suicidal but was pursuing a hunger strike to secure a transfer to another facility, among other goals. We can readily infer that knowledge of this purported motivation might lead other inmates to blame DOCCS if Dorsey's uninterrupted conduct resulted in his death or other serious permanent injury, believing that DOCCS should have given Dorsey what he wanted in order to stop the hunger strike. A choice to save the life of one inmate by, for example, granting a transfer, would undoubtedly encourage countless others to engage in the same life-threatening behavior in order to obtain whatever relief they sought—a transfer, a special diet, enhanced visitation privileges or the like. Needless to say, if correctional institutions were unable to intervene by obtaining a force-feeding order and their only choice was between doing nothing—letting the inmate die—or acceding to the inmate's demands, this would seriously hamper efforts to maintain safety and discipline within the facility.

It is therefore evident that DOCCS' decision to intervene when Dorsey's hunger strike progressed to the point that his life was in jeopardy was reasonably related to legitimate penological objectives. Taking action to interrupt an inmate hunger strike not only serves to preserve life and prevent a suicide but also to maintain institutional order and security. There was no way that DOCCS could effectuate these interests other than to seek a judicial order permitting feeding by nasogastric tube—less intrusive means had been attempted without success. Dorsey had been moved to the infirmary and medical staff within the facility had repeatedly counseled him in an attempt

to get him to voluntarily abandon the hunger strike (as he had done before) to no avail.

Dorsey attempts to dilute the interests advanced by DOCCS by emphasizing that his intent was to secure a transfer (among other objectives), not to commit suicide. But even if we take Dorsey at his word, we fail to see how this strengthens his claim. Many hunger strikes addressed by appellate courts have involved inmates who professed to have some objective other than causing their own deaths (*see e.g. Coleman*, 303 Conn 800, 805, 38 A3d 84, 90 [2012], *supra* [inmate stated that he was pursuing hunger strike to protest his "broken family" and asserted wrongful conviction]; *State of North Dakota ex rel. Schuetzle v Vogel*, 537 NW2d 358 [1995] [inmate said he would resume eating and taking diabetes medication if reinstated to work release program, among other demands]). Dorsey's purported motivation—the fact that he sought a transfer, in addition to other relief—does not mitigate the risks described above; in some ways, as we have explained, it enhances them.

Indeed, Dorsey's assertion that his goal was to secure a transfer and bring attention to alleged mistreatment by DOCCS undermines the strength of his own interest in continuing the hunger strike. If that was truly his intent, he had ample other ways to pursue those objectives. In fact, according to his testimony at the hearing, Dorsey was simultaneously utilizing several other means available to him to protest his treatment by DOCCS, including bringing litigation in federal court and filing grievances within the prison system. In some circumstances we do not doubt that the right to refuse medical treatment is a prerogative that is compatible with incarceration. But, even if we assume that some permutation of that right was implicated here, its invocation as part of a strategy to strong-arm DOCCS into granting a privilege to which Dorsey was not otherwise entitled is obviously not. For all of these reasons, Dorsey's constitutional challenge to Supreme Court's order was properly rejected.

In closing, it can fairly be said that, given the psychological strain of incarceration, inmates are a vulnerable population insofar as suicide is concerned. Neither their interests nor those of society would be served by a rule that unduly restricts prison authorities' ability to secure judicial review in a case like this one where, regardless of his intent, an inmate's life was imperiled by a hunger strike. If a higher burden were imposed on prison staff, it is likely that fewer petitions would be filed by

DOCCS—meaning fewer of these disputes would be resolved by the courts.[7] In the long run, we doubt this would result in greater protection of inmate rights.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN (dissenting). The Court today offers its views on a range of interesting, important and to some extent novel questions having to do with the respective prerogatives of prison inmates and correctional authorities in the context of inmate hunger strikes. None of these issues, however, is properly before the Court. As petitioner points out and respondent essentially concedes, these matters were never raised, much less decided, at nisi prius and, consequently, are not preserved for this Court's review (*see e.g. Matter of Yeshivath Shearith Hapletah v Assessor of Town of Fallsburg*, 79 NY2d 244, 252 [1992]; *McMillan v State of New York*, 72 NY2d 871, 872 [1988]; *and see generally* Arthur Karger, Powers of the New York Court of Appeals § 14:1 [3d ed rev 2005]). Petitioner has, accordingly, requested that this appeal be dismissed, and I would agree that that is the proper disposition but for the circumstance that a dismissal would leave standing an Appellate Division decision that itself lacked an adequate jurisdictional predicate. It is not disputed that by the time the Appellate Division issued its decision in this matter, the case had been mooted. The court nonetheless declined to dismiss the appeal on that ground, but rather invoked the exception to the mootness doctrine for substantial and novel matters likely to recur yet evade review (91 AD3d 1051, 1052 [3d Dept 2012]). Although the majority concludes that this was a proper resort to the mootness exception, it is, I believe, clear that it was not and that the exception's use to support appellate review of this matter is not consistent with the governing principles set forth in *Matter of Hearst Corp. v*

---

7. The dissent asserts that no restrictive rule has been proposed here—but this is not true. Dorsey argues that the State should have to establish, through individual evidence in each case, that it had a compelling interest in ending the hunger strike of the particular inmate in question (despite its conclusion that the case is moot, the dissent hints that it agrees). If we adopted that view, a higher burden would be imposed on DOCCS in seeking judicial intervention which, in turn, would reduce the number of applications filed—and DOCCS would have to postpone bringing a petition until it had evidence of specific disruptive consequences stemming from the hunger strike. Since DOCCS' primary objective is the preservation of life, the timing of a petition should turn, as it now does, on the physical condition of the hunger-striking inmate. A policy that required DOCCS to adopt this type of "wait and see" attitude would further endanger the inmate's life.

*Clyne* (50 NY2d 707 [1980]). Inasmuch as I can see no basis for the appellate address of issues that are not only unpreserved but irredeemably moot, I cannot join in the advisory opinion the Court now issues, which is not only untethered to any live dispute, but substantially without connection to any relevant factual fundament. I would reverse the order of the Appellate Division and remand the matter with the direction that the appeal be dismissed solely on the ground of mootness (*see id.* at 718; *Matter of City of Utica v Daines*, 21 NY3d 878 [2013]; *Matter of Gold-Greenberger v Human Resources Admin. of City of N.Y.*, 77 NY2d 973, 974 [1991]; *Matter of Adirondack League Club v Board of Black Riv. Regulating Dist.*, 301 NY 219, 223 [1950]).

I

In October 2010 the once morbidly obese respondent, then an inmate at Great Meadow Correctional Facility, began a hunger strike to protest his treatment at the facility. In the course of the ensuing month he lost about 20 pounds and was transferred to the correctional facility's medical unit so that his condition could be closely monitored. On November 22, 2010, this CPLR article 4 proceeding was commenced by order to show cause; petitioner Bezio, the Superintendent of Great Meadow Correctional Facility, in accordance with the relevant directive and protocol of the Department of Corrections and Community Supervision (DOCCS) (Dept of Corr & Community Supervision Directive No. 4309; DOCCS Health Services Policy Manual § 1.30), neither of which has ever been challenged in this litigation,[1] sought to obtain judicial authorization to force feed respondent by means of a nasogastric tube. In a supporting affirmation, Facility Medical Director, Dr. David Karandy, expressed

---

1. Indeed, although the majority decries the prospect of "a rule that unduly restricts prison authorities' ability to secure judicial review in a case like this one" (majority op at 107), it is clear that no such restrictive rule has ever been proposed in this litigation. It is not disputed that respondent Dorsey's hunger strike objective was, in fact, to obtain judicial review of his situation, and his appellate counsel has confirmed that "at no time did respondent challenge the constitutionality of DOCCS Directive 4309." Counsel explains that

> "Through its Directive, DOCCS appears to give appropriate recognition to a hunger striking inmate's liberty and privacy interests by requiring DOCCS to seek a court order in order to permit the agency to force feed a hunger striking inmate. As such respondent has no issue with the Directive."

the view that respondent was competent[2] but manipulative. Respondent, he said, had refused to take solid nutrition[3] even though the health risks of continuing his fast had been explained. Dr. Karandy stated that if respondent did not accept nutrition he would suffer organ damage and would die.

At a hearing held on November 23, 2010—one day after the order to show cause was signed—Dr. Karandy testified that respondent's fast, if allowed to continue, would lead to a severe electrolyte imbalance, and thus risk cardiac arrhythmia and/or a heart attack. The doctor said that, unless respondent received vital nutrients, he would perish. Although the majority repeatedly asserts that that eventuality was imminent, Dr. Karandy did not testify to that effect and there is no other evidence to support that conclusion in the record.

Petitioner's counsel attempted to elicit from Dr. Karandy testimony as to the burden respondent's hunger strike placed on the prison facility and its medical resources,[4] but the proposed testimony was objected to on the ground that the Department of Corrections would be responsible for respondent's welfare in any event. The court sustained the objection, leaving the record completely undeveloped as to whether there was an institutional, i.e., penological, rationale to support the relief requested by petitioner.

Inquiry was made of Dr. Karandy by respondent as to whether respondent's consumption of the liquid dietary supplement Ensure would alleviate his symptoms and as to whether, in view of respondent's willingness to ingest the supplement, its use would be a less intrusive alternative to force feeding. Dr. Karandy acknowledged that respondent's voluntary consumption of Ensure would be an alternative to force feeding, but said that it was not DOCCS's policy to make that nutritional supplement available to hunger strikers; otherwise the supplement would be used to prolong the refusal to eat solid food, a

---

**2.** Also accompanying the petition was a psychiatric assessment of respondent by Dr. Michael Slome. In Slome's view, respondent did not suffer from a serious mental disorder. He characterized respondent as "coherent and logical." Respondent, Slome said, explained that he sought through his hunger strike to force petitioner to take him to court where he would be able to air his grievances over his treatment in prison.

**3.** Respondent had been consuming various fluids.

**4.** Petitioner's counsel proposed "to show that the institutional order is negatively impacted when one inmate is on hunger strike and that a negatively impacted institutional order [impacts] the safety and welfare of other inmates."

manipulative purpose that DOCCS did not want to encourage, particularly since Ensure was significantly more expensive than the regularly provided institutional fare.

Dr. Karandy did not bring respondent's prison medical records to court. Respondent's counsel, who evidently had been assigned shortly before the hearing, therefore requested an adjournment to obtain and review those records, and perhaps have them reviewed as well by a non-DOCCS medical expert. He repeatedly claimed that he could not properly cross-examine Dr. Karandy without reviewing the records. The court, however, refused to grant a continuance.

The allegedly gravely depleted respondent represented himself, apparently quite energetically, during part of the hearing, and testified at length, claiming vehemently to have been repeatedly mistreated during his time at Great Meadow. He said that the purpose of his hunger strike was to protest that mistreatment and to occasion a judicial proceeding in which he could air his grievances publicly. His counsel too urged that respondent's hunger strike was a form of protest, and relatedly, that it was not informed by suicidal intent. That respondent was not, in fact, suicidal was confirmed in petitioner's submissions in support of its forced feeding application. One of those submissions, a psychiatric assessment performed for Dr. Karandy by Dr. Michael Slome, stated categorically that respondent was not suicidal.[5]

The court, however, indicated that it was not concerned with respondent's motives but only with the circumstance that he was not eating and that the medical testimony was to the effect that the continuation of his fast would have grave health consequences. The court pronounced itself satisfied that there was clear and convincing evidence that respondent had voluntarily refused nutrition and that the proposed intervention, although entailing certain risks, was in respondent's best interests.[6] As to less restrictive alternatives, the court found that there were

---

**5.** It is, accordingly, not essential to respondent's claim that he was not suicidal to take as "dispositive" his own denials of that state of mind. There was, in fact, no evidence at all that respondent was suicidal. As noted, the only clinical evidence was precisely to the contrary.

**6.** In applying these decisional standards, it would appear that the court was attempting to indicate that the criteria for involuntary treatment of a decisionally incompetent adult set forth in *Rivers v Katz* (67 NY2d 485, 497-498 [1986]) had been met. Respondent, however, was concededly competent. That being the case, the relevant question under *Rivers*—one never litigated before

*(n. cont'd)*

none, but a moment later remarked to respondent "I think Ensure is a great alternative for you." Ultimately, he granted the petition to the extent of directing that, if respondent did not voluntarily consume food along with the Ensure he had requested, petitioner would be authorized to force feed him via a nasogastric tube.

On appeal, respondent, now represented by Mental Hygiene Legal Service, argued, for the first time in the litigation, that, as a competent adult, he had the right to make decisions about his own medical treatment, and that the State had not demonstrated a sufficient overriding interest to force treatment upon him.

The Appellate Division, while recognizing that the appeal was moot, since the challenged order, conditionally authorizing respondent's force feeding for a year, had expired while the appeal was pending and respondent had, in any case, been transferred to a different correctional facility and had not been force fed—that having been unnecessary since he had been given Ensure—nonetheless addressed some points raised by respondent (but not others) under the exception to the mootness doctrine occasionally invoked to allow appellate consideration of substantial and novel issues of public importance that will recur yet typically evade review (*see* 91 AD3d at 1052, citing *Matter of Fosmire v Nicoleau*, 75 NY2d 218, 221 n 1 [1990]). The court expressly did not address respondent's appellate points urging that his request for a continuance should have been granted and that the hearing evidence did not support the hearing court's finding that his life was imminently at risk (*see id.*). Those proceeding-specific issues, the Appellate Division said, were not captured by the exception to the mootness doctrine. On the other hand, the court was of the view that it would be appropriate to review under the mootness doctrine exception defendant's appellate contention that he could not be force fed since his fast was not intended to be suicidal but rather an act of protest. The court, however, elsewhere noted that respondent had not "directly asserted" a free speech claim on appeal (91 AD3d at 1054 n). This circumstance notwithstanding, the court entered upon a wide-ranging consideration of respondent's right to make decisions respecting his medical treatment and the

the hearing court—was not whether the proposed treatment would be in respondent's best interests, but whether there was a state interest sufficiently compelling to overcome his right as a competent adult to refuse treatment (*id.* at 498).

weight it should be given when opposed to the State's interest in preserving life, and specifically in protecting the health and welfare of those in its custody. It reasoned that the privacy and liberty interests of prison inmates were reduced (*see id.* at 1053, citing *Matter of Doe v Coughlin*, 71 NY2d 48, 53 [1987], *cert denied* 488 US 879 [1988]) and thus could be impinged simply upon a showing that the proposed impingement was reasonably related to the achievement of a legitimate penological purpose (*see id.*, citing *Turner v Safley*, 482 US 78, 89 [1987]). The court concluded that

> "[w]here, as Supreme Court found here, an inmate's refusal to eat has placed that inmate at risk of serious injury and death, we hold—along with the majority of courts that have considered the issue—that the State's interest in protecting the health and welfare of persons in its custody outweighs an individual inmate's right to make personal choices about what nourishment to accept [collecting citations]" (91 AD3d at 1053).

## II

It is manifest that the question of whether respondent's right to refuse medical treatment was properly eclipsed by some countervailing interest of the State—either in preventing suicide or maintaining order in its penal facilities—was never litigated before Supreme Court. There is no reading of the record of the proceedings in that court that would support a contrary conclusion, and respondent all but concedes the point when he acknowledges that he "did not clearly articulate this legal argument at trial." His argument that the issue is nonetheless preserved merely because he opposed the State's petition, finds no support in our jurisprudence and, if accepted, would stunningly enlarge our scope of review. While I am sure that that is not what the Court intends, it offers no alternative theory by which the issues it addresses might plausibly be deemed preserved, and thus properly before us on this appeal, as issues of law.

Respondent's assigned counsel never argued at the hearing upon the petition, even obliquely, that his client had a right to refuse treatment; counsel simply questioned whether Dr. Karandy had accurately assessed the gravity of respondent's condition and whether there was a less intrusive alternative to force feeding. The closest he came to raising an objection to the

proposed intervention rooted in an assertion of a superior right of respondent to persist in his fast, was when he described the fast as a form of free speech, but no First Amendment claim was thereafter developed, either at the hearing or on appeal. And, while the State's attorney attempted to elicit testimony to show that there was a legitimate penologic rationale for bringing respondent's fast to a compelled end, the hearing court refused to allow that testimony.[7] There is, moreover, no indication that Supreme Court, in determining conditionally to authorize petitioner to force feed respondent, engaged in any consideration of the relative strength of the parties' respective interests and prerogatives. The court simply concluded that respondent was at risk and that he should be treated, if necessary against his will in the invasive manner proposed by petitioner.

The Appellate Division decision, then, in purporting to weigh respondent's right to control his medical treatment against the interests of the State—and particularly as against the interests of the State as a penal custodian—addressed unpreserved issues which this Court may not review. Had those issues been merely unpreserved, that, of course, would not have prevented the Appellate Division from reaching and deciding them in the exercise of its interests of justice power. The difficulty here, however, is that the entire appeal—including, of course, the unpreserved issues the Appellate Division chose to address—was, as the Appellate Division itself observed, moot, and it is very difficult to understand the court's rationale for resorting to its interests of justice power[8] to address utterly unpreserved and factually undeveloped issues in a situation where its decision would, by hypothesis, have no actual consequence for any party to the litigation.

Be this as it may, the threshold legal issue from our perspective would appear to be whether the Appellate Division abused

---

7. This may have been because the court evidently understood the relevant decisional criteria to be those applied where involuntary treatment is sought as to an allegedly incompetent adult (*see* n 6, *supra*). Had respondent been incompetent, the State, as the substituted decision maker, would not have had to demonstrate an interest sufficient to overcome respondent's refusal, only that the measures it proposed to take in its parens patriae capacity would, in fact, be in respondent's best interests and narrowly tailored to give substantive effect to his liberty interest (*see Rivers*, 67 NY2d at 497).

8. Although the Appellate Division did not in its order specify that it was invoking its interests of justice jurisdiction, that omission is not binding on this Court, and given the lack of preservation, there could have been no other ground for the review the court undertook.

its discretion in invoking the mootness doctrine exception to review issues unreviewable as issues of law.

It is a core purpose of the mootness doctrine to prevent courts from issuing unreviewable advisories that may, as purported adjudications, "spawn[ ] . . . legal consequences" (*see Matter of Hearst Corp.*, 50 NY2d at 718). Here, the moot issues that the Appellate Division reached out to address, evidently as an exercise of its interests of justice jurisdiction, are not properly subject to further appellate review because they are not preserved, and it was thus not consistent with the mootness doctrine or its narrowly drawn exception, for the court to have decided those issues. The exception to the doctrine requiring courts to refrain from deciding moot questions is not appropriately relied upon where the resulting precedent cannot be further scrutinized up the appellate ladder and will potentially give rise to or "spawn" its own perhaps idiosyncratic eddy of legal consequences. It is true that intermediate appellate courts can and do issue unreviewable precedents when they exercise their interests of justice power—a circumstance that has been a subject of recent consternation to members of this Court's bench (*see e.g. People v Riley*, 19 NY3d 944 [2012])—but there can be no occasion for the exercise of that extraordinary power under the aegis of the mootness exception.

The Appellate Division apparently was swayed in its application of the mootness exception by the circumstance that the issues raised on appeal were weighty. But even important issues may be irretrievably moot (*see Matter of Hearst*, 50 NY2d at 715). Although the precise issues addressed by the Appellate Division are not settled (*cf. id.*), there is substantial precedent from this Court directly relevant to their disposition (*see e.g. Matter of Fosmire v Nicoleau*, 75 NY2d 218 [1990]; *Rivers v Katz*, 67 NY2d 485 [1986]; *Matter of Doe v Coughlin*, 71 NY2d at 53), and an Appellate Division decision, cited approvingly by the majority, addressing a very similar scenario (*see Matter of Von Holden v Chapman*, 87 AD2d 66 [4th Dept 1982]).[9] There was then no particularly compelling need for the immediate generation of precedent—certainly none that would justify the address of issues which, in addition to being moot, were unpreserved and consequently factually undeveloped.

---

**9.** It should be noted, however, that, as counsel for respondent points out, *Matter of Von Holden* was decided before *Rivers* and *Fosmire*, and, at least arguably, is not current in its analysis of the hunger strike issues addressed.

Moreover, the Appellate Division's selective application of the exception to mootness to save for review some, but not other, issues within the identical moot matter, operated to sever logically intertwined issues, and artificially to permit the consideration of issues at an initial level of abstraction incompatible with the inductive common-law method (*see Matter of Hearst Corp.*, 50 NY2d at 717). Significant preserved arguments were made at the Appellate Division as to the adequacy of the factual predicate for the hearing court's finding that respondent's life was imminently endangered. Not only did Dr. Karandy never actually testify as to the imminence of the predicted harm, but the testimony he did give was substantially untested, since respondent's counsel, evidently assigned virtually on the spot, was forced to cross-examine him without having been afforded access to respondent's medical records, a circumstance that the hearing court described as "unfortunate[ ]" but refused to rectify. These issues, it is true, were moot, but then so must have been the dependent issues the Appellate Division elected to address.

It is one thing to assume a matter in an appellant's favor in order to demonstrate that it would not ultimately avail him or her; it is quite another to assume the correctness of a trial court's disposition of an issue that has become moot—and is therefore unreviewable—as a ground for reaching and deciding against an appellant yet another moot issue. The latter is what was done in this case. It is clear that if the Appellate Division was to premise its analysis upon the finding that the State had a sufficiently compelling interest to justify the force-feeding of respondent, it could only have been upon the trial court's finding that respondent's life was seriously imperiled, yet the propriety of that finding the Appellate Division correctly deemed a moot question, and thus a matter not properly before it. Having reached that conclusion, the court was not then free to engage in the appellate gymnastic of leapfrogging to the adjudication of other dependent issues. A case like this one, moot in its most basic parts, is moot in its entirety; it should not be an occasion for adjudication, much less for adjudication affecting fundamental liberty and privacy interests. The exception to the mootness doctrine was not, and is not now, properly used to facilitate such an exercise.

Of course, nothing I have said means that a hunger strike case would not be a worthy candidate for consideration under the mootness doctrine exception; only that when the exception

is invoked it should be to address preserved issues in a logical order and on an adequate record.

## III

The result of the majority's insistence on addressing matters both moot and unpreserved, is a decision rich in broad assertions based on compound inferences only tenuously, if at all, grounded in the appellate record. As a general matter, I do not disagree with the proposition that DOCCS should be able to secure judicial review when an inmate places his or her life in imminent jeopardy by refusing to eat, but that is a proposition that has never been challenged in this litigation (*see* n 1, *supra*). Nor do I disagree that when an inmate places his or her life in immediate danger by declining nutrition, that a force-feeding order may on occasion be justified by the State's interest in preventing suicide or in maintaining order in its prisons. To the extent that this appeal may be understood to be about an actual case, however, it is about Mr. Dorsey and whether the particular circumstances attending his fast provided the necessary justification for the force feeding order issued as to him. But, like the Appellate Division, the majority finds moot the issues Mr. Dorsey actually raised at his hearing as to the basis for the hearing court's finding that his life was at risk,[10] and then moves on—evidently supposing that that finding was properly made, or that even if it was not it doesn't matter since Mr. Dorsey will no longer be affected by any assumption the Court makes—to the consideration of the interests the State has advanced to support the proposed intervention. At this point, of course, we are no longer actually dealing with Mr. Dorsey, but with a straw man who has starved himself to death's door in order, as the majority has put it, "to strong-arm DOCCS into granting a privilege" (majority op at 107).

Here the analysis becomes remarkably abstract, as it must, because there is no record at all to support the State's claim either that Mr. Dorsey was suicidal or that his fast had any significant effect on prison order. As noted, DOCCS's own consulting psychiatrist stated flatly in his assessment that Mr. Dorsey was not suicidal. He was undoubtedly manipulative, but all civil disobedience is manipulative. Manipulativeness, obviously, is not a

---

**10.** Mr. Dorsey continues to maintain that the finding that his life was at risk was made in consequence of a hearing at which his due process rights were violated. He has not then abandoned his contention that the finding is invalid.

sufficient predicate for forced feeding by the State. Assuming, however, that Mr. Dorsey's strike had progressed to the point that his life was actually in jeopardy, the State may have had grounds to compel him to accept nutrition, but our cases lend no support to the majority's present holding to the effect that such orders may, in such circumstances, be had for the asking, without any showing of actual institutional need, since it is universally recognized—practically a matter appropriate for judicial notice—that inmate hunger strikes "can" have a significant destablizing effect and because it can be "readily infer[red] that knowledge of this purported [manipulative] motivation *might* lead other inmates to blame DOCCS if [an inmate's] uninterrupted conduct resulted in his death or other serious permanent injury" (majority op at 106 [emphasis supplied]). Indeed, this approach would appear to be completely at odds with *Rivers*'s injunction that "due process requires that a court balance the individual's liberty interest against the State's asserted compelling need *on the facts of each case* to determine whether [treatment] may be forcibly administered" (67 NY2d at 498 [emphasis supplied]).

While the majority urges that the State should be relieved of demonstrating an institutional (i.e., penological) rationale for force feeding in this case particularly, since it attempted to make such a showing and was prevented from doing so when the court sustained respondent's objection, it does not follow that because a party has been erroneously prevented from adducing proof essential to its claim that the proof can be assumed. In such a circumstance we ordinarily remit to permit the party an opportunity to make the necessary showing, if it can. Of course, that would be pointless here, since the matter is moot. But rather than acknowledge that impediment to appellate review, the majority forges ahead, embracing the notion that the State's legitimate penological interest in force feeding hunger striking prisoners is in all cases self-evident. The majority has, as a matter of process, gone very far afield, and the result of this exercise is a statement of broad policy that is difficult to reconcile with our precedents properly rooted in real cases.

## IV

This State's common law has long recognized that a competent adult may not be forced to accept medical treatment, even in situations where the treatment would save or prolong life (*see*

*Schloendorff v Society of N.Y. Hosp.*, 211 NY 125, 129 [1914]; *Matter of Fosmire*, 75 NY2d at 231). The right to refuse treatment, we have held, is a kind of liberty interest within the protective ambit of the Due Process Clause of the State Constitution (*see Rivers*, 67 NY2d at 493). While the right may be overcome in compelling circumstances justifying the State's resort to its police power (*id.* at 495), and the State may thus intervene to prevent suicide (*Matter of Fosmire*, 75 NY2d at 227), the individual's basic prerogative to make decisions affecting his or her own personal health and right to be left alone, i.e. to personal privacy, ordinarily will trump even the best intended state intervention (*see id.* at 228).

This balance of power, it is true, may change when the State in its capacity as a penal custodian seeks to treat an inmate already palpably deprived of liberty and privacy (*see Matter of Doe v Coughlin*, 71 NY2d at 53). But it is clear that inmates retain liberty and privacy interests to the extent that those interests are not incompatible with their incarceration and legitimate penological objectives (*see id.*).

The State, as a penal custodian, has a duty to provide those involuntarily in its charge with necessary medical care. But the State may not, simply because it is acting as a custodian, require a competent inmate to accept the care and treatment it makes available. While it is not difficult to think of situations in which the State's undoubted interest in maintaining order in its prisons and the health of the general inmate population would be sufficient to require individual inmates to accept medical treatment over their objection, it is also not particularly difficult to think of scenarios in which an inmate's privacy and liberty interests, even though diminished, could not be overcome— situations in which the assertion of those interests involved no substantial detriment to prison order. It is, I believe, far from a foregone conclusion that a fasting prisoner—even one whose health has significantly deteriorated—may never refuse the nutrition that the State would force upon him or her. Although the majority allows that there are circumstances in which an inmate's refusal of treatment is compatible with incarceration, it appears to hold that where there is a deliberate refusal to eat the State may, without any showing of institutional need, obtain a force feed order, purely to avert personal harm. But if as is entirely possible—notwithstanding all that the majority has said "can" and "might" happen—a prisoner's fast has no significant demonstrable institutional consequence, it is difficult to

perceive the justification for treating a prisoner's prerogatives with respect to his or her person differently than those of a nonincarcerated individual. A prisoner on a medical unit, either in a prison or in the community, might well refuse treatment, including nutrients, without compromising the achievement of any legitimate penological objective and, in that case, should not be treated differently from any other patient. Even a fasting prisoner in the general prison population will not necessarily impair the functioning and order of the penal institution. Here, however, defendant was segregated on the prison medical unit for most of his fast and there was absolutely no showing that the fast was inciting or otherwise seriously deleterious to the safety and order of the prison (cf. *Matter of Von Holden*, 87 AD2d at 67). There are, of course, burdens to the State eventuated by a prison inmate's fast, but there are public burdens attributable to most refusals of life sustaining nutrition and medical assistance. These, however, cannot themselves suffice to overcome a competent adult's privacy, liberty and expressional interests, even in an institutional setting where those interests are reduced (*see Rivers*, 67 NY2d 485 [1986] [a decisionally competent, psychiatrically committed individual may refuse treatment with neuroleptic medications]). In the absence of some predicate justifying the exercise of the State's police power or, in the prison context, some showing that the ascendancy of the subject personal interests is incompatible with the safe, purposeful and reasonably efficient running of the facility, state interference in a competent adult's decisions respecting his or her body and medical care is, I believe, incompatible with this jurisdiction's precedents. Inasmuch as neither condition of state intervention was demonstrated at the hearing upon the instant petition, there does not appear to have been an adequate legal ground for ordering that respondent be force-fed.

Of course, none of the foregoing arguments were made by respondent who was evidently delighted to have had his day in court and to have had the court direct what he had requested all along—that he be given Ensure. That the case bearing his name should have thereafter persisted and resulted in two appellate opinions having literally nothing to do with what was actually litigated before the hearing court, is a legally inexplicable circumstance of which not even the most manipulative prisoner could have dreamt. The wish to promote rules protective of a vulnerable population is generally laudable, but this is an appellate and not a legislative process, and there is in this

litigation not even a moot contention that DOCCS's existing rules—even when implemented in the legal context established by *Rivers* and *Fosmire*—are somehow inadequate to afford prisoners the protection that they should have.

Judges READ, SMITH and PIGOTT concur with Judge GRAFFEO; Chief Judge LIPPMAN dissents and votes to reverse in an opinion in which Judge RIVERA concurs.

Order affirmed, without costs.