[31 NYS3d 45]

Sara Myers et al., Appellants, v Eric Schneiderman, in His Official Capacity as Attorney General of the State of New York, Respondent, et al., Defendants.

First Department, May 3, 2016

52

**APPEARANCES OF COUNSEL**

*Eric T. Schneiderman, Attorney General*, New York City (*Anisha S. Dasgupta, Holly A. Thomas* and *Steven C. Wu* of counsel), for respondent.

*Edward T. Mechmann*, New York City, and *Kelley Drye & Warren LLP*, New York City (*Neil M. Merkl* of counsel), for New York Catholic Conference, amicus curiae.

*Michael Gilberg*, Granite Springs, and *Stephen F. Gold*, of the Pennsylvania bar, admitted pro hac vice, for Not Dead Yet and others, amici curiae.

**OPINION OF THE COURT**

MAZZARELLI, J.

Nearly 20 years ago, the United States Supreme Court held that New York's prohibition against assisting one who attempts suicide does not violate the Equal Protection Clause of the Fourteenth Amendment when enforced against a physician who assists in hastening the death, through the prescription of lethal medication, of a mentally competent, terminally ill patient who is suffering great pain and desires to die (*Vacco v Quill*, 521 US 793 [1997]). The Supreme Court also held, in an opinion published the same day as *Vacco*, that Washington State's own ban on assisted suicide (since overturned by legislation in that state), considered in the same context, does not violate substantive due process under the US Constitution (*Washington v Glucksberg*, 521 US 702, 705-706 [1997]). Now, a group of plaintiffs composed of physicians, patients and

advocates for the terminally ill, including some who were plaintiffs in *Vacco*, seek a declaration that the ban on physician-assisted suicide, which they call "aid-in-dying" (a term we use here) violates the Equal Protection and Due Process Clauses of the State Constitution. They also seek a declaration that, as a matter of statutory construction, the relevant Penal Law provisions are not applicable to aid-in-dying.

Plaintiffs in this case are Sara Myers, a terminally ill person, Eric Seiff, who suffers from an illness that he is concerned may progress to a terminal stage, five medical professionals who regularly treat terminally ill patients, and End of Life Choices New York, a not-for-profit organization that provides its clients with information and counseling on informed choices in end-of-life decision-making.[1] Plaintiffs maintain that, without a declaration to the contrary, the named physicians would be subject to criminal prosecution if they took steps to carry out the wish of their patients to hasten their deaths, and put an end to unbearable physical pain, by prescribing lethal medication. Plaintiffs presume that any such prosecution would be based on section 120.30 of the Penal Law, which provides that "[a] person is guilty of promoting a suicide attempt when he intentionally causes or aids another person to attempt suicide," and section 125.15 (3), which provides that "[a] person is guilty of manslaughter in the second degree when," among other things, "[h]e intentionally causes or aids another person to commit suicide." Plaintiffs initially named the Attorney General and the District Attorneys of various counties in New York State. However, plaintiffs discontinued the action against the District Attorneys upon the District Attorneys' stipulation to be bound by any result reached in the litigation.

The complaint asserts that the physician plaintiffs have been deterred by the relevant provisions of the Penal Law from providing aid-in-dying to terminally ill and mentally competent persons who have no chance of recovery and for whom medicine cannot offer any hope other than some degree of symptomatic relief. They assert that the authorities wrongly consider aid-in-dying to be "assisted suicide," but that in fact it is starkly distinct from it. The complaint alleges that "[o]ver the past eighteen years, an increasing number of States and jurisdic-

---

**1.** Steve Goldenberg, a terminally ill person who was a named plaintiff when the action was commenced, passed away in January 2016. Plaintiffs filed a notice of death indicating that his claims devolved to the surviving plaintiffs (*see* CPLR 1015 [b]).

tions have legalized aid-in-dying through judicial decisions and legislation," and submit that "evolving medical standards and public views support aid-in-dying." It further alleges that the physician plaintiffs all believe that "it would be consistent with the highest standards of medical practice to assist and counsel mentally-competent, terminally-ill patients . . . in their decision to seek a peaceful death through aid-in-dying."

The Attorney General moved to dismiss the complaint pursuant to CPLR 3211 (a) (2) and (7) and the court granted the motion. The court disagreed with the Attorney General's argument that the claims were not justiciable and that plaintiffs did not have standing to sue. However, it rejected plaintiffs' claim that the Penal Law should be interpreted not to apply to aid-in-dying, stating that the Penal Law as written is clear and concise, rendering unnecessary any resort to an analysis of its legislative history. The court found that the constitutional claims were controlled by *Vacco*, and by *Matter of Bezio v Dorsey* (21 NY3d 93 [2013]), in which the Court of Appeals referenced the State's constitutionally-permissible distinction, recognized in *Vacco*, between the right to refuse medical treatment and the right to commit suicide or receive assistance in doing so.

On appeal, plaintiffs assert that the court should not have dismissed the complaint because it, along with affidavits submitted by three of the medical professional plaintiffs (including their voluminous exhibits), asserted factual allegations that, on their face, stated a claim for the requested relief. They contend that the court lacked the power to disregard factual statements pronouncing, for example, that professional organizations such as the American Public Health Association do not consider aid-in-dying to be equivalent to suicide, and that death certificates in Oregon and Washington, where aid-in-dying has been deemed lawful, list the cause of death as the underlying disease causing the patient's suffering, not the lethal medication administered to him or her. They further argue that the court ignored their allegation that aid-in-dying is indistinguishable from other medical practices that are universally recognized as not constituting suicide, such as terminal sedation, in which a patient is placed in a deep sedation while food and fluids are withheld. Plaintiffs further contend that the court misapprehended their argument concerning the Penal Law sections at issue. They challenge the court's approach, which looked at the meaning of the language in the statutes. Instead, they maintain that the prohibition

against assisted suicide simply does not apply to aid-in-dying, which they assert was not even a recognized concept in 1965, when the statutes were enacted in their current form.

As for plaintiffs' State Constitution-based claims, they principally argue that the court overlooked that New York has long recognized the existence of a person's fundamental right to self-determination over his or her own body and the type of medical treatment he or she receives. Thus, they assert, to the extent that the Penal Law does prohibit aid-in-dying, the law must be strictly scrutinized and may only be enforced in that context if it can be said to be narrowly tailored to advance a compelling State interest. Even if a fundamental right is not at issue, plaintiffs contend, their complaint establishes sufficient factual allegations such that discovery should proceed on the issue of whether the relevant statutory sections are rationally related to a legitimate government interest. Plaintiffs further claim that the court failed to distinguish between their equal protection and substantive due process claims, addressing only the former. To the extent that, in rejecting the equal protection claim, the court relied on *Matter of Bezio v Dorsey*, plaintiffs assert that it is inapposite, since that case did not address aid-in-dying. They also question the court's reliance on *Vacco v Quill*, since it analyzed the right to aid-in-dying under the United States Constitution, not the New York State Constitution.

Finally, plaintiffs stress the United States Supreme Court's observation in *Vacco* that there may be some scenario where the Penal Law sections at issue could clash with patients' freedom, and that, as reflected in recent Supreme Court cases such as *Obergefell v Hodges* (576 US —, —, 135 S Ct 2584, 2602 [2015]), which recognized a constitutional right to same-sex marriage, evolving social views are entitled to consideration in identifying rights that historically were rejected by the courts.

The paramount goal in interpreting a statute is to effectuate the intent of the legislature, and clear and unambiguous statutory language should be construed so as to give effect to its the plain meaning (*see People v Finnegan*, 85 NY2d 53, 58 [1995], *cert denied* 516 US 919 [1995]).

> "In construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradic-

tion, there is no room for construction and courts have no right to add to or take away from that meaning" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998] [internal quotation marks omitted]).

In the absence of any controlling statutory definition, reviewing courts construe words of ordinary import "with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as 'useful guideposts' in determining the meaning of a word or phrase" (*Rosner v Metropolitan Prop. & Liab. Ins. Co.*, 96 NY2d 475, 479-480 [2001]).

The word "suicide" has a straightforward meaning and a dictionary is hardly necessary to construe the thrust of Penal Law §§ 120.30 and 125.15. It is traditionally defined as "the act or an instance of taking one's own life voluntarily and intentionally," especially "by a person of years of discretion and of sound mind" (Merriam-Webster's Collegiate Dictionary [11th ed 2003], suicide). Whatever label one puts on the act that plaintiffs are asking us to permit, it unquestionably fits that literal description, since there is a direct causative link between the medication proposed to be administered by plaintiff physicians and their patients' demise. Of course, plaintiffs urge on us that adhering to a literal construction misses their point, which is that the term "suicide" traditionally connotes a person's conscious choice favoring death over life. Plaintiffs argue that aid-in-dying reflects a starkly different choice; that of death by a quick and painless means over death that is equally certain to happen in reasonably close temporal proximity but in a manner that is sure to be unbearably painful. According to plaintiffs, by the time aid-in-dying would be considered, life, at least one that to them is worth living, is unfortunately no longer something the patient is free to choose.

The Court of Appeals has addressed the purported dichotomy between suicide and aid-in-dying, albeit obliquely, in a manner that suggests that the statute does prohibit the latter practice. In *People v Duffy* (79 NY2d 611 [1992]), which unquestionably falls in the former category, the defendant was accused of recklessly encouraging a 17-year-old youth to shoot himself to death after the youth became distraught by a failed romance. In rejecting the defendant's argument that Penal Law § 125.15 (3), which explicitly refers to "intentional" conduct, did not apply to his allegedly reckless conduct, the Court of Appeals

referred to the Staff Notes of the Commission on Revision of the Penal Law and Criminal Code, released in 1964, which reflected the Commission's conclusion that section 125.15 (3) "applies even where the defendant is motivated by 'sympathetic' concerns, such as the desire to relieve a terminally ill person from the agony of a painful disease" (79 NY2d at 615). The Court of Appeals thus concluded that if the "intentional" act of assisting a person in causing his or her own death is prohibited even if done out of sheer humanitarianism, then surely a reckless act such as that committed by the defendant in *Duffy* is also prohibited.

■ Plaintiffs assert that *Duffy* and the Staff Note that it cites have no bearing on this case. That is because, according to plaintiffs, the scenario laid out in the Staff Note does not necessarily describe aid-in-dying, since the hypothetical assistant is not described as a trained physician and the person taking his or her own life has not been identified as a competent individual. Nonetheless, we know of no rule of statutory construction that permits us to ignore the plain language of a term because there is a possibility that the legislature, writing on a blank slate, would have chosen to carve out of that definition a particular application of the term. To the contrary,

> "[i]t is a general rule of construction that omissions in a statute cannot be supplied by construction; omissions are to be remedied by the Legislature, and not by the courts. Thus, a court cannot amend a statute by inserting words that are not there, nor will a court read into a statute a provision which the Legislature did not see fit to enact. . . . Stated differently, judges should not attempt to fill up a *casus omissus* and interpolate into a statute what in their opinion should have been put there by its framers, however just and desirable it may be to supply the omitted provision" (McKinney's Cons Laws of NY, Book 1, Statutes § 363, Comment; *see also People v Boothe*, 16 NY3d 195, 198 [2011] ["It is well settled that courts are not to legislate under the guise of interpretation" (internal quotation marks omitted)]).

In light of the plain meaning of the term suicide, we hold, as a matter of statutory construction, that Penal Law §§ 120.30 and 125.15 prohibit aid-in-dying.

■ Turning to the constitutional claims, in seeking a declaration that a ban on aid-in-dying violates their state constitutional equal protection and due process rights, plaintiffs start from a position of relative weakness, because the United States Supreme Court has already held that it does not violate those rights under the United States Constitution. As noted above, *Vacco v Quill* (521 US 793 [1997], *supra*) dealt with whether New York's assisted suicide prohibition, as applied to aid-in-dying, violated the Fourteenth Amendment's Equal Protection Clause. The plaintiffs in *Vacco* argued that the ban did, because it illegally differentiated between mentally competent, terminally ill patients seeking such medical intervention and mentally competent, terminally ill patients who refused lifesaving medical treatment. The fact that one choice was banned and the other perfectly legal, they argued, was arbitrary and irrational. The Supreme Court found this to be a false juxtaposition because the two groups of patients were entirely separate classes, not a single class with some being treated differently from others. As the Supreme Court noted,

> "On their faces, neither New York's ban on assisting suicide nor its statutes permitting patients to refuse medical treatment treat anyone differently from anyone else or draw any distinctions between persons. *Everyone*, regardless of physical condition, is entitled, if competent, to refuse unwanted lifesaving medical treatment; *no one* is permitted to assist a suicide" (521 US at 800).

The Supreme Court observed that the distinction between the two methods of ending life was "widely recognized and endorsed in the medical profession and in our legal traditions, is both important and logical; it is certainly rational" (*id.* at 800-801). The Supreme Court cited to the American Medical Association's Council on Ethical and Judicial Affairs, as well as the New York State Task Force on Life and the Law, both of which had published papers endorsing the view that the refusal of treatment and the affirmative administration of life-ending medication are fundamentally different things (*id.* at 800 n 6). It also conceded that there are differences of opinion on the question, as noted by the Task Force (*id.*).

■ In *Washington v Glucksberg*, the Supreme Court found that Washington State's ban on assisted suicide posed no substantive due process threat to physicians administering lethal medications to their competent, terminally ill patients.

Notwithstanding that Oregon had already passed legislation permitting aid-in-dying, and that other jurisdictions, including foreign countries, continued to struggle with the issue, the Supreme Court found that the ban implicated no fundamental liberty interest, and that Washington's ban was rationally related to its interests in preserving human life, protecting the integrity and ethics of the medical profession, and ensuring the welfare of vulnerable groups.

In general, the New York Court of Appeals uses the same analytical framework as the Supreme Court in considering due process cases, though, at times, it has found that the State Due Process Clause may be more protective of rights than its federal counterpart (*see Hernandez v Robles*, 7 NY3d 338, 361-362 [2006], *abrogated on other grounds by Obergefell v Hodges*, 576 US —, 135 S Ct 2584 [2015], *supra*). By contrast, it has held that our Equal Protection Clause "is no broader in coverage than the Federal provision" (*id.* at 362 [internal quotation marks omitted]).

In arguing that this Court should interpret the right to aid-in-dying more broadly than did the United States Supreme Court in *Washington v Glucksberg*, plaintiffs note that New York has for a long time treated a person's freedom of choice with respect to his or her own body and medical treatment as a vitally important right to be subordinated to the State's prerogatives under only compelling circumstances. This is unquestionably so. For example, the Court of Appeals has held that a mentally competent patient confined to a state mental hospital has the right to refuse antipsychotic medication (*Rivers v Katz*, 67 NY2d 485 [1986]) and that a competent adult member of Jehovah's Witnesses can decline a blood transfusion (*Matter of Fosmire v Nicoleau*, 75 NY2d 218 [1990]). Further, in *Matter of Storar* (52 NY2d 363 [1981], *cert denied* 454 US 858 [1981]), the Court of Appeals upheld an order granting the appointment of a representative to carry out the expressly stated wish of a person not to be kept on life support, which wish was conveyed before he entered a vegetative coma with no reasonable hope of recovery. Both *Matter of Fosmire* and *Storar* relied on the common law, although *Rivers* noted that the "common-law right is coextensive with the patient's liberty interest protected by the due process clause of our State Constitution" (67 NY2d at 493).

Nevertheless, these cases all involved a patient's right to refuse medical treatment, and are rooted in the same concepts

that give rise to a cause of action for medical malpractice based on the lack of informed consent (*see Matter of Storar*, 52 NY2d at 376 ["every person 'of adult years and sound mind has a right to determine what (should) be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages' "], quoting *Schloendorff v Society of N.Y. Hosp.*, 211 NY 125, 129-130 [1914, Cardozo, J.]). Thus, plaintiffs have a heavy burden of persuasion in arguing that the same principles apply to the affirmative act of taking one's own life.

Plaintiffs have failed to overcome this burden. Only three years ago, the Court of Appeals observed that "the State has long made a constitutionally-permissible distinction between a right to refuse medical treatment and a right to commit suicide (or receive assistance in doing so)" (*Matter of Bezio v Dorsey*, 21 NY3d at 103, citing *Vacco*). To be sure, *Matter of Bezio* did not deal with end-of-life decision-making, but we are mindful of the Court of Appeals' recognition that aid-in-dying has been held to be fundamentally different from the refusal to receive life-prolonging measures. Further, plaintiffs offer nothing other than conclusory arguments for why, unlike the United States Constitution, the New York State Constitution should be construed to extend the right to refuse treatment, and let nature take its course, to a fundamental right to receive treatment that does the opposite.

Plaintiffs contend that, even if the right to aid-in-dying is not a fundamental one, the State still must show that the ban is rationally related to a legitimate government interest. Of course, the United States Supreme Court already held that it is (*Vacco*, 521 US at 808-809). Recognizing this, plaintiffs point to *Glucksberg*'s coda, which stated that "[t]hroughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide. Our holding permits this debate to continue, as it should in a democratic society" (521 US at 735). Plaintiffs interpret this language as an invitation to present evidence of how that debate has evolved to where there is now a consensus that, whether or not the right to aid-in-dying is fundamental, the State has no interest, much less a legitimate one, in banning it. They also cite *Vacco*'s suggestion that future challenges to the aid-in-dying ban may be appropriate:

> "Justice Stevens observes that our holding today
> 'does not foreclose the possibility that some applica-

tions of the New York statute may impose an intolerable intrusion on the patient's freedom' *Ante*, at 751-752 (opinion concurring in judgments). This is true, but, as we observe in *Glucksberg, ante,* at 735, n. 24, a particular plaintiff hoping to show that New York's assisted-suicide ban was unconstitutional in his particular case would need to present different and considerably stronger arguments than those advanced by respondents here" (521 US at 809 n 13).

Plaintiffs contend that their complaint and the affidavits they submitted in opposition to defendants' motion to dismiss present such "different and considerably stronger arguments" and that, at the very least, they have presented sufficient allegations to at least develop a full evidentiary record as to whether aid-in-dying is rationally related to a legitimate government interest and whether, for equal protection purposes, it is functionally indistinct from the refusal to be kept alive.

██ ██ In arguing that the landscape has shifted sufficiently that the courts should now consider their constitutional claims, plaintiffs specifically point to the adoption of policies by four associations in favor of aid-in-dying. However, this evidence does not sufficiently demonstrate a societal evolution on the question of aid-in-dying such that, if the ban is upheld, we would be paying blind adherence to outmoded thinking (*compare Obergefell v Hodges*, 576 US at —, 135 S Ct at 2602 [2015] [recognizing the right to same-sex marriage arises, in part, "from a better informed understanding of how constitutional imperatives define a liberty that remains urgent in our own era"]). For instance, two of the organizations whose conclusions plaintiffs present as evidence that opinion on the issue of aid-in-dying has changed, the American College of Legal Medicine and the American Medical Women's Association, expressly acknowledge in their policies that a wide range of views continues to exist *within their own memberships* concerning end-of-life treatment options. *Principles Regarding Physician Aid in Dying*, promulgated by the American Medical Student Association, recognizes and acknowledges all of the concerns voiced by opponents of the practice, and calls for ongoing adjustment of the criteria "according to evolving opinion" among doctors, patients, families and the public (American Student Medical Association, AMSA Preamble, Purposes and Principles, *Principles Regarding Physician Aid in Dying* at 79-80 [2015]). Notably, plaintiffs do not assert any change in

position of the American Medical Association, the conclusion of which, that " '[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer,' " was favorably quoted by the Supreme Court in *Glucksberg* (521 US at 731).

Plaintiffs also allege in their complaint that Gallup and Pew Research polls, both conducted in 2013, found, respectively, that "70% of Americans are in favor of allowing doctors to help terminally-ill patients end their life by painless means" and that "62% of Americans believe that patients should be able to end their life if suffering great pain with no hope of improvement." However, there is no indication that the questions underlying these polls were specifically about aid-in-dying, as opposed to more passive end-of-life choices such as withdrawal of hydration and nutrition. In either event, plaintiffs fail to allege whether those public polls reflect the opinion of people who are fully informed of the arguments espoused by those who caution against permitting aid-in-dying, such as those articulated in the New York State Task Force on Life and the Law. Moreover, plaintiffs fail to allege whether public polling (to the extent there was any on the issue at the time *Vacco* was decided) has changed significantly over the past 20 years.

The Supreme Court of Canada's recent striking down of that country's prohibition against suicide as applied to aid-in-dying (*Carter v Canada [Attorney General]*, 2015 SCC 5, [2015] 1 SCR 331 [Can]) should have no bearing on the issue in this country. Our highest Court's holding that there is no fundamental right to take one's own life was based on its reluctance to "reverse centuries of legal doctrine and practice, and [to] strike down the considered policy choice of almost every State" (*Glucksberg* at 723). The Canada court did not discuss or consider the extent that permitting aid-in-dying would clash with its own legal traditions. Rather, it found that the right to take one's own life was part of a person's liberty interest in being able to make decisions concerning his or her bodily integrity and medical care, a right our Supreme Court has recognized (*see Cruzan v Director, Mo. Dept. of Health*, 497 US 261 [1990]), but has refused to extend to aid-in-dying.

Finally, plaintiffs rely on two papers that purport to offer empirical evidence that Oregon's Death with Dignity Act (Or Rev Stat § 127.800 *et seq.*), now in effect for over 20 years, has not invited the fears articulated by people opposed to aid-in-dying, such as an adverse impact on vulnerable populations,

and the difficulty in distinguishing whether a wish to end one's life is driven by a desire to control one's death, clinical depression, or something else. However, even were a finder of fact to determine that aid-in-dying is "workable," the issue before us transcends mere practical concerns. As the Supreme Court stated in *Glucksberg*, a state's interest in preserving human life "is symbolic and aspirational as well as practical" (521 US at 729), favorably quoting the New York State Task Force, which observed:

> " 'While suicide is no longer prohibited or penalized, the ban against assisted suicide and euthanasia shores up the notion of limits in human relationships. It reflects the gravity with which we view the decision to take one's own life or the life of another, and our reluctance to encourage or promote these decisions.' New York Task Force 131-132" (*id.*).

Our decision herein should not be viewed as reflecting a lack of sympathy for those suffering as death approaches, or even our opinion that aid-in-dying should never be introduced in New York as a viable option so long as appropriate safeguards are in place. However, we do not write on a blank slate, given the Penal Law as written and the Supreme Court and Court of Appeals' opinions, by which we are bound. Rather, our only role in this appeal is to consider whether the facts alleged in the complaint fit within any cognizable legal theory (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]). We find that, even giving plaintiffs the benefit of every reasonable inference, they have not presented sufficient allegations to suggest that the Penal Law has an implicit carve-out for aid-in-dying, or that, notwithstanding the precedents on the matter, the constitutionality of aid-in-dying is ripe for judicial reconsideration.

The issue before us unquestionably presents a host of legitimate concerns on both sides of the debate. As discussed above, plaintiffs present some compelling reasons for making aid-in-dying a legitimate option for those suffering from terminal illness. At the same time, the New York State Task Force on Life and the Law[2] in 1994 "unanimously recommend[ed] that New York laws prohibiting assisted suicide and

---

2. According to its website, the Task Force was established in 1985 by Governor Mario Cuomo, and consists of 23 Governor-appointed experts who volunteer their time to assist the State in developing public policy on issues arising at the interface of medicine, law, and ethics. The Task Force is

euthanasia should not be changed" (*see* New York State Task Force on Life and the Law, When Death Is Sought: Assisted Suicide and Euthanasia in the Medical Context [May 1994]). The Task Force based its view on the risks that could be presented to the elderly, poor, socially disadvantaged, and those without access to good medical care; and the role of treatable symptoms such as pain and depression in creating a desire for lethal medications. It also noted that most doctors lack a sufficiently close relationship to their patients to appropriately evaluate a request for help in ending life, and expressed the concern that it could open the door to euthanasia of those incapable of giving consent. We are not persuaded from the record before us that, even though society's viewpoints on a host of social issues have changed over the last 20 years, aid-in-dying is an issue where a legitimate consensus has formed. Accordingly, we are without power to rewrite the law, or to declare that the law violates a fundamental right that has never been articulated by the United States Supreme Court or even our Court of Appeals. Indeed, "the manner by which the State addresses complex societal and governmental issues is a subject left to the discretion of the political branches of government" (*Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d 14, 28 [2006] [internal quotation marks omitted]). Considering the complexity of the concerns presented here, we defer to the political branches of government on the question of whether aid-in-dying should be considered a prosecutable offense.

Accordingly, the order of the Supreme Court, New York County (Joan M. Kenney, J.), entered October 19, 2015, which granted defendant Attorney General's pre-answer motion to dismiss the complaint, should be modified, on the law, to declare that (a) Penal Law §§ 120.30 and 125.15 provide a valid statutory basis to prosecute licensed physicians, who provide aid-in-dying, and (b) that to the extent that Penal Law §§ 120.30 and 125.15 prohibit a licensed physician from providing aid-in-dying, the application of that statute to such conduct does not violate the New York State Constitution, and, as so modified, affirmed, without costs.

RENWICK, MANZANET-DANIELS and KAPNICK, JJ., concur.

Order, Supreme Court, New York County, entered October 19, 2015, modified, on the law, to declare in defendant New

---

comprised of leaders in the fields of religion, philosophy, law, medicine, nursing, and bioethics, and is chaired by New York State's Commissioner of Health.

York State Attorney General's favor, and, as so modified, affirmed, without costs.