Beadell v Eros Mgt. Realty LLC (2026 NY Slip Op 00962)

Beadell v Eros Mgt. Realty LLC

2026 NY Slip Op 00962

Decided on February 19, 2026

Court of Appeals

Cannataro, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 19, 2026

No. 11 

[*1]Virginia Beadell et al., Appellants,
vEros Management Realty LLC, et al., Respondents, et al., Defendants.

Brian J. Issac, for appellants.
Jessica L. Smith, for respondents. 
The Hotel Association of New York City et al., amici curiae.

CANNATARO, J.

The question we must answer on this appeal is whether defendants, the owner and operator of a hotel, assumed a duty of care to a suicidal hotel guest by agreeing to requests from family members, first, to check on him in his hotel room and, second, to immediately call for emergency assistance. As to the first part, we hold that any duty defendants may have assumed was satisfied. As to the second, we hold that defendants did not assume a duty to decedent under the circumstances.
In May 2017, decedent was a guest at a hotel in Midtown Manhattan. On the evening of May 26, decedent exchanged text messages with his wife, who was located in Nebraska, in which he expressed that he intended to end his life. Decedent's wife then contacted decedent's sister, who was located in [*2]Minnesota, for assistance [FN1]. Since neither woman knew what hotel decedent was staying in, decedent's sister called her mother, who was also located in Nebraska, to learn his exact location. At 6:40 p.m.,[FN2] after the mother provided the hotel's name and phone number, decedent's sister called the hotel's front desk. The sister told the front desk clerk that she was concerned decedent might be suicidal, as he had sent a photo of himself looking down from a ledge, and asked that they check on him. In response, hotel staff visually confirmed that there was no one on the roof or the 15th floor balcony. The front desk clerk and another hotel employee then went to decedent's 11th floor room. When decedent answered the door, they observed empty liquor bottles and pill containers in the room [FN3]. However, decedent told them that he was "fine" and did not wish to be disturbed. At 6:46 p.m., the clerk called the sister back and related that they went to the room and that he was "fine."
Decedent continued to exchange text messages with his wife and sister. At 7:12 p.m., after receiving a message in which decedent seemed to be saying goodbye, the sister again called the front desk, this time identifying herself as a mental health professional, stating that the situation was escalating, and asking for police to be contacted immediately and for decedent to be placed on a 72-hour hold. Hotel staff agreed to contact the police. About 15 minutes later, however, an assistant manager called the sister back to make sure that she really wanted the police involved. Decedent's sister confirmed that she did. At about the same time, decedent's wife also called the hotel and learned that the police had not yet been summoned. The wife then made her own request for the front desk clerk to call the police right away. Neither decedent's wife nor his sister made any attempt to contact emergency services themselves. Hotel staff ultimately called 911 at 7:37 p.m., and the assistant manager simultaneously went to the police station located next door to get assistance.
Several police officers accompanied the assistant manager back to the hotel. They were unable to gain access to the room because decedent would not answer the door, which was latched from the inside. A hotel engineer was summoned and, after about 10 or 15 minutes, the engineer was able to break the lock allowing the police to enter. Decedent, who appeared intoxicated and emotionally distraught, was found lying on the window ledge. A police officer spoke to him and attempted to persuade him to come back inside, but decedent jumped to his death shortly before 8:00 p.m.
Plaintiffs, decedent's mother and wife, individually and as co-administrators of decedent's estate, commenced this negligence and wrongful death action against, as relevant here, defendants Eros Management Realty, LLC and Tryp Management Inc., the owner and operator of the hotel, respectively. Their theory of liability was that, in response to the family members' warnings that decedent was expressing [*3]suicidal ideation and threatening to end his life, defendants assumed a duty to take certain preventive measures to deter decedent's suicide, and failed to properly discharge that duty.[FN4]
Defendants moved for summary judgment, asserting that they had not assumed any duty to decedent and that they were in no way responsible for his death. They characterized any argument that decedent's suicide could have been prevented had emergency assistance been contacted sooner as entirely speculative, observing that decedent did not take his life until after authorities entered the room. Alternatively, they argued that, even if they had assumed a duty of care, that duty had been fulfilled, and that any breach of a duty on their part was not a proximate cause of decedent's death.
In opposition, plaintiffs argued that defendants assumed the duty to contact 911 immediately upon promising to do so in the 7:12 p.m. call, and that the negligent delay in obtaining police assistance resulted in the loss of opportunity to prevent decedent's suicide. Plaintiffs submitted affidavits from three expert witnesses. As relevant here, the affidavit from plaintiffs' expert in psychology and neurology opined that the delay in contacting police, which the expert characterized as almost one hour, "was a critical loss of opportunity for intervention to prevent the suicide" when "time was of the essence." The expert opined that decedent's continued communication with his family members demonstrated his "ambivalence" toward taking his own life but that, with the passage of time and consumption of alcohol, he continued to deteriorate and become more depressed. The expert opined that generally, earlier intervention provides a better chance to prevent a suicide, observing that "[m]ost suicides are preventable and every minute counts." Plaintiffs also provided an affidavit from a former New York City police officer with training in suicide prevention, who opined that the opportunity to prevent decedent's suicide was lost due to the failure to timely contact the police. The expert further opined that, had the police "been notified in a timely fashion, they would have found [decedent] still safely in his room, and not on the ledge" and would have taken him into custody for psychiatric evaluation.
Supreme Court denied defendants' motion. The court found that defendants had assumed a duty to take reasonable steps to prevent decedent from harming himself and had met their prima facie burden of establishing that they fulfilled the assumed duty. The court also concluded that plaintiffs raised triable issues of fact in opposition to the motion as to whether defendants exercised due care in discharging that duty, particularly with respect to whether the police were contacted during a reasonable time and whether the 25-minute delay in calling for emergency assistance significantly contributed to decedent's suicide.
The Appellate Division reversed, on the law, granted defendants' motion for summary judgment and dismissed the complaint (229 AD3d 43 [1st Dept 2024]). The Court held that defendants met their burden of establishing that they did not assume a duty to prevent decedent's suicide, observing that the hotel did not isolate or take control of decedent, or put him in a more vulnerable position than he would have been in had the hotel never attempted to help. The Court further concluded that, even if a duty to call the police had been assumed, the duty was fulfilled, such that defendants were not the proximate cause of decedent's death, and plaintiffs failed to raise a triable issue of fact in opposition.
One Justice dissented, and would have denied summary judgment, opining that a reasonable jury could have found that defendants' failure to discharge the assumed duty to call the police was negligent and that the failure to perform that duty with due care was a proximate cause of decedent's suicide. We granted plaintiffs' motion for leave to appeal (43 NY3d 955 [2025]).
It is well-settled that the moving party on a motion for summary judgment has the initial burden of making a prima facie showing that they are entitled to judgment as a matter of law (see Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]; Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). If that showing is made, the burden then shifts to the nonmoving party to establish the existence of material and triable issues of fact (see id.). In the context of a motion for summary judgment, the facts must be considered in the light most favorable to the nonmoving party (see Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 340 [2011]).
Plaintiffs concede that defendants did not have an underlying legal duty to prevent decedent, a hotel guest, from taking his own life. It is undisputed that defendants, as the owner and operator of the premises, are not insurers of a visitor's safety. Rather, plaintiffs' theory of liability is one of assumed duty. "[E]ven when no original duty is owed to the plaintiff to undertake affirmative action, once it is voluntarily undertaken, it must be performed with due care" (Parvi v City of Kingston, 41 NY2d 553, 559 [1977]). As explained by Chief Judge Cardozo, "[t]he hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all" (Moch Co. v Rensselaer Water Co., 247 NY 160, 167 [1928]). "If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward . . . The query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good" (Moch Co., 247 NY at 167-168; Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 522 [1980]).
Thus, to be held liable under an assumed duty theory, it is not enough that defendants undertook to perform a service and did so negligently, but their "conduct in undertaking the service [must have] somehow placed [decedent] in a more vulnerable position than he would have been in had [defendants] never taken any action at all" (50 NY2d at 522). One way in which an undertaking may increase a party's vulnerability is by lulling them into a false sense of security; thus, the assumed duty analysis incorporates an aspect of reliance (see Heard v City of New York, 82 NY2d 66, 72-73 [1993]). Where a plaintiff alleges reliance on a defendant's undertaking, it must have been "reasonably foreseeable" that the plaintiff would "tailor their own conduct" in response to defendant's undertaking (Nallan, 50 NY2d at 523).
Contrary to the dissent's contention, this framework does not "improperly interject[] performance of a duty and proximate cause" into the assumed duty analysis (dissenting op at 8). The Restatement confirms that reliance and increased risk are considerations which may go to the existence of an assumed duty in the first instance:
"An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if:
(a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or
(b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking" (Restatement [Third] of Torts § 42 [2012]).
Whether an actor "has a duty of reasonable care" based on an undertaking thus depends on whether the actor's conduct "increases the risk of harm," or "another relies on the actor's exercising reasonable care" (id.). This understanding is consistent with Nallan and Heard, as the Restatement indicates (see id. Comment f [categorizing Nallan as requiring increased risk or reliance and Heard as "insist(ing)" on increased risk for imposition of a duty]), as well as with the decisions of numerous other state high courts (see e.g. Mullins v Pine Manor College, 389 Mass 47, 53-54, 449 NE2d 331, 336 [1983] ["(T)he mere fact that (defendant) had voluntarily undertaken to render a service is not sufficient to impose a duty"; increased risk or reliance must also be shown]; Ostendorf v Clark Equipment Co., 122 SW3d 530, 538-539 [Ky 2003] [*4][defendant "owed no duty" based on undertaking in the absence of increased risk or reliance]; see also Jefferson County Sch. Dist. R-1 v Justus, 725 P2d 767, 771 [Colo 1986]).
To the extent the dissent's contrary view relies on the Restatement (Second) of Torts § 324 (dissenting op at 8-9 n 2), the precursor of the Restatement (Third) of Torts § 44, those sections provide that when an actor "takes charge" of another who reasonably appears to be "helpless," the actor has a duty of reasonable care "while the other is within [their] charge," as well as if they discontinue aid or protection (Restatement [Third] of Torts § 44 [2012]; see also Restatement [Second] of Torts § 324 [1965]). But plaintiffs have raised no allegation here that defendants "took charge" of an apparently "helpless" individual (cf. Parvi, 41 NY2d at 559-560 [plaintiff was intoxicated, and police took custody of him]). Rather, plaintiffs have alleged that defendants assumed a duty under the theory of Nallan and Heard, which is properly understood as the voluntary undertaking theory of Restatement (Third) § 42 (see Nallan, 50 NY2d at 523 [citing section 42's predecessor, Restatement (Second) of Torts § 323 (1965)]; Heard, 82 NY2d at 73 [same]). Accordingly, in determining whether defendants assumed a duty, we must consider whether plaintiffs have shown reliance or increased risk.[FN5]
We specifically understand plaintiffs to be arguing that defendants assumed a duty to decedent to (1) check on him following the 6:40 p.m. call and (2) call 911 immediately following the 7:12 p.m. call, by gratuitously promising to decedent's family that they would perform those acts. Plaintiffs argue that defendants negligently performed that assumed duty by inaccurately reporting that decedent was "fine" after they checked on him, and by failing to summon police assistance immediately upon request at 7:12 p.m. They argue that the representations made to decedent's family members, of which decedent was unaware, induced the family members not to summon aid themselves.
Any duty defendants may have assumed in agreeing to check on decedent was satisfied. The hotel staff determined that he was not on the balcony, the roof or the ledge of his own room. They also spoke with decedent face-to-face, at which point he advised that he was fine and did not want to be disturbed. Any assumption of a duty in this regard did not include the obligation to provide a detailed report of observations of decedent's condition or the state of his room to his family members. Nor did it require hotel staff members, who had neither expertise in mental health nor information about decedent's mental health history, to make an independent assessment about the risk decedent may have posed to himself or to take further action against his wishes based on any such assessment.
As to the alleged duty to call 911, there is no dispute that hotel staff contacted the police, even going to the police station to get assistance, and that the police arrived in time to speak to decedent, although they were ultimately unsuccessful in preventing his suicide. Plaintiffs nonetheless argue that defendant failed to perform the alleged duty with reasonable care, because they did not do so immediately following the 7:12 p.m. call. This argument is ultimately unavailing.
The crux of plaintiffs' argument is that defendants' promise to immediately call 911 induced his family members not to summon aid themselves, thus creating a lost opportunity to prevent decedent's [*5]suicide. Decedent's mere presence in the hotel did not give defendants control over his person, nor did their actions affirmatively place him in a more vulnerable position than he was when they undertook to act (compare Parvi, 41 NY2d at 559; Ferrer v Riverbay Corp., 214 AD2d 312 [1st Dept 1995]). Under the circumstances, plaintiffs failed to raise a material question of fact as to whether it was reasonably foreseeable that they would forgo other efforts to summon aid in reliance on defendants' promise to call 911 (see Nallan, 50 NY2d at 522-23 [defendant "could be held liable under an 'assumed duty' theory only if it was reasonably foreseeable" that plaintiff would rely on defendant's conduct and "tailor their own conduct accordingly"]; see also Heard, 82 NY2d at 73 [no liability where defendant's conduct "created no justifiable reliance"]). Even if plaintiffs could rely on the hotel's representations that there would be a call to 911, it was not reasonable for the family to expect that any such call would be made with the desired immediacy. This became evident when the manager called decedent's sister back and expressed reluctance to involve the police, a circumstance that still did not induce the family members to act on their own behalf. Significantly, defendants' promise to call 911 did not prevent decedent's family members from undertaking their own efforts to secure professional assistance nor otherwise obstruct such efforts, for example, by refusing to confirm decedent's presence in the hotel. Indeed, an emergency call to 911 from a trained mental health worker, like decedent's sister, might be expected to enhance response time to the hotel. We do not mean to suggest that the family members bear responsibility for decedent's suicide. Nonetheless, defendants cannot be held liable under an assumed duty theory where plaintiffs' reliance was not reasonably foreseeable (see Nallan, 50 NY2d at 522-523).
In any event, we would be reluctant to recognize a legal duty in this type of case on policy grounds. "The existence and scope of a tortfeasor's duty is, of course, a legal question for the courts. . . . We fix the point of a duty in a particular case by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability. This policy-driven analysis reflects that, [a]t its foundation, the common law of torts is a means of apportioning risks and allocating the burden of loss" (Moore Charitable Found. v PJT Partners, Inc., 40 NY3d 150, 160-161 [2023] [internal quotation marks and citations omitted]).
Recognizing an assumed duty in these circumstances would create a specter of liability that discourages rather than encourages hotels from offering assistance to guests contemplating suicide. Because hotels owe no inherent duty to provide such aid, the most rational and likely way for them to avoid liability would be to implement formal policies against their employees involving themselves in efforts to render potentially life-saving aid to guests. In keeping with the State's "interest[] in preserving life and preventing suicide" (Matter of Bezio v Dorsey, 21 NY3d 93, 101 [2013]), the better rule is one that incentivizes both hotels and concerned parties to do all they reasonably can in these difficult and emotionally charged situations.
In closing, we do not hold that an assumed duty can never arise where a hotel undertakes to obtain timely medical or emergency assistance for a guest. For instance, we would have a closer question here if hotel staff had actively discouraged decedent's family members from attempting to obtain help themselves. However, under the circumstances presented, no duty was assumed.
Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.

WILSON, Chief Judge (dissenting):

Dr. Noah Beadell, a neurologist who lived in Nebraska, was a guest at the TRYP Hotel in New York City while attending a medical convention. He had a history of mental health struggles, including a prior suicide attempt. From his hotel room, he sent his wife, Kayla Greeninger, and his sister, Gabrielle Anderson, texts, calls, and photos expressing that he was contemplating suicide. From their respective homes in Nebraska and Minnesota, Ms. Greeninger and Ms. Anderson repeatedly and urgently contacted the hotel for help. The first requests were to check on Dr. Beadell because he was suicidal. The subsequent requests, most pertinent here, were simple: call the police immediately and tell them to put Dr. Beadell on a [*6]72-hour psychiatric hold. The hotel said they would call the police, but did not. Instead, 14 minutes later, they again spoke to Ms. Anderson to ask if she really wanted them to call the police. Even after she insisted that they do, they waited another 11 minutes. The Midtown Police Precinct South, by the way, is next door to the TRYP hotel. Approximately 90 minutes after their initial call to the hotel, Dr. Beadell jumped to his death from his 11th story room.
Dr. Beadell's wife and mother, individually and on behalf of his estate, commenced this action against Eros Management Realty, LLC ("Eros"), and Tryp Management Inc., the owners and operators of TRYP Hotel ("TRYP"), alleging that Eros and TRYP assumed a duty of care on behalf of Dr. Beadell, and their negligence in performing said these duties eliminated the opportunity to prevent his suicide. Eros and TRYP moved for summary judgment, alleging they had no duty as a matter of law, and that even if they did, their actions were reasonable, and that any claims their actions were the proximate cause of Dr. Beadell's death were speculative.
The majority, in determining that Eros and TRYP had no duty, blends performance of a duty and proximate cause within the same analysis. By doing so, the majority's analysis implicitly mischaracterizes the duty plaintiffs have alleged Eros and TRYP owed Dr. Beadell to include preventing Dr. Beadell's suicide. Plaintiffs do not allege that Eros and TRYP assumed a duty to prevent Dr. Beadell's suicide. Instead, they allege that Eros and TRYP assumed a duty to check on Dr. Beadell and a duty to call 911 immediately, and that Eros and TRYP's negligent performance of those specific assumed duties impeded the opportunity to save Dr. Beadell.
I believe it is quite clear from the record that Eros and TRYP [FN1] voluntarily assumed two duties: initially, to go check that Dr. Beadell was not on a ledge or balcony; subsequently, to call the police immediately, report that Dr. Beadell was suicidal, and relay that his sister, a mental health therapist, had requested that he be placed on a 72-hour hold. As to the first duty, TRYP discharged it by checking on Dr. Beadell and reporting back that he was in his room and said he was tired and wanted to rest. As to the second, however, the evidence does not conclusively establish that TRYP was not negligent in failing to call the police immediately. Likewise, plaintiffs present an issue of fact as to whether TRYP's delay in summoning the police was a proximate cause of Dr. Beadell's death, by diminishing the opportunity to prevent his suicide. Said simply, when presented with a life-or-death emergency, someone who undertakes to perform an act and fails to do so with due care should be held liable if their failure is a proximate cause of harm. Accordingly, I dissent.I.
On May 26, 2017, at approximately 8:00 P.M., Dr. Beadell died by suicide after jumping from the ledge of his room at TRYP Hotel. Earlier that evening, Dr. Beadell, a doctor visiting New York City to attend a Radiology Convention, exchanged a series of anxious and distressed text messages and phone calls with his wife, Kayla Greeninger, including a 6:24 P.M. photo of his feet, standing on a ledge looking down to the street far below. After receiving said photo, Ms. Greeninger immediately contacted Dr. Beadell's sister, Gabrielle Anderson, who is a therapist. Ms. Anderson phoned her mother to find out where her brother, Dr. Beadell, was staying. Around 6:40 P.M., Ms. Anderson called the hotel, told the desk attendant that her brother Dr. Beadell was a guest at the hotel and that "he was on ledge or a roof or ledge of some sort" and that she "was concerned he was going to kill himself," and asked the desk attendant to check on Dr. Beadell's safety. The desk attendant stated that the hotel would send security up to check on him. The hotel's assistant manager sent a bellboy and hotel engineer to check the 15th floor balcony for a suicidal [*7]guest. The assistant manager thereafter sent the engineer to check the roof and instructed the bellboy to accompany the desk attendant to check on Dr. Beadell at his 11th floor hotel room.
At 6:46 P.M., the desk attendant called Ms. Anderson back and informed her that they checked on Dr. Beadell, he was in his room, "appeared fine" and told the hotel personnel that he did not want to be disturbed. Depositions later revealed that the desk attendant and the bellboy observed Dr. Beadell answer the door with a flushed face, as if he had been crying, and saw empty liquor bottles and pill containers throughout the room. They did not inform Ms. Anderson of those facts.
The majority erroneously states that the hotel staff had no information about Dr. Beadell's mental health history (majority op at 11). Quite to the contrary, the desk attendant's incident report recounts that, when the desk attendant called Ms. Anderson back to report that the hotel staff had checked on Dr. Beadell "to let her know he was ok," on this 6:46 P.M. call Ms. Anderson "stated he has made a suicidal attempt prior, to make sure that he does become involved with the police as she is fearful he may do something if he is by himself and furthermore, he knows how to get out of the 72 hour clinical hold since he is a medical professional himself." The desk attendant then "advised [Ms. Anderson] I will let the authorities know so that way they can handle the situation from there." Between 7:00 P.M. and 7:12 P.M. Dr. Beadell texted his sister twice, telling her "goodbye" and that their family had "done all [they] could." At 7:12 P.M., Ms. Anderson called the hotel again, explaining that she was a mental health professional, that Dr. Beadell was obviously not fine, that he had a history of depression and a previous suicide attempt, that she believed he was going to harm himself, and that the hotel needed to contact the police immediately and ask them to put Dr. Beadell in a 72-hour psychiatric hold. The hotel staff told Ms. Anderson they would contact the police immediately.
At 7:21 P.M., Dr. Beadell called his wife, during which he continued to express suicidal ideations, and said "goodbye" and "I can't do this anymore." She immediately contacted the hotel again at 7:25 P.M. to follow up, and was told that hotel staff were attempting to contact the police, but that Dr. Beadell seemed fine. Also, around 7:25 P.M., The assistant manager called Ms. Anderson and asked whether she was sure that the hotel should call the police as once they arrived the employees "could no longer keep them away." Ms. Anderson was furious the hotel had not yet called the police despite telling her they would do so at least ten minutes prior and said "of course, I need you to contact the police, as I told you the first time." The assistant manager responded that they would call the police immediately. Both Ms. Greeninger and Ms. Anderson testified that they did not call the police because they thought, based on the hotel's assertions, the hotel had already done so or was doing so.
At 7:37 P.M., 25 minutes after initially telling Ms. Anderson they would contact the police and 11 minutes after assuring they would do so a second time, the hotel finally called 911. The assistant manager additionally went in person to the police precinct, located directly next door to the hotel, and brought two police officers back with her. The police and hotel staff arrived at Dr. Beadell's hotel room and began knocking a few minutes later. It took another 20-30 minutes to get an engineer to open Dr. Beadell's door, where they found an empty bottle of alcohol, pill bottles, and Dr. Beadell waiting on the ledge. An officer spent around three minutes attempting to build rapport with Dr. Beadell and talk him down, at which point Dr. Beadell jumped from the ledge and perished.II.
The appeal is before us on summary judgment. Thus, Eros and TRYP are required to "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985] [citations omitted]). Facts must be considered in the light most favorable to the plaintiffs (Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011]), "and all reasonable inferences must be drawn in favor of the nonmoving party" (Prendergast v New York City Tr. Auth., 220 AD3d 583, 584 [1st Dept 2023]). Eros and TRYP failed to show they are entitled to judgment as a matter of law.[*8]A.
It is well settled under New York common law that "even when no original duty is owed to the plaintiff to undertake affirmative action, once it is voluntarily undertaken, it must be performed with due care" (Parvi v Kingston, 41 NY2d 553, 559 [1977]; see also Wolf v New York, 39 NY2d 568, 573 [1976] ["Where a party voluntarily assumes the performance of a duty, he is required to perform it carefully, not omitting to do what an ordinarily prudent person would do in accomplishing the task"]; Marks v Nambil Realty Co., 245 NY 256, 258 [1927] ["He is charged with liability because having chosen to perform he has thereby become subject to a duty in respect of the manner of performance"]; Glanzer v Shepard, 233 NY 236, 239 [1922] ["It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all"]).
Once a court finds such a duty has been assumed, the query as to liability, as explained by Chief Judge Cardozo, "is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good" (H.R. Moch Co. v Rensselaer Water Co., 247 NY 160, 168 [1928]; see also Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 522 [1980] [noting that in an assumption of duty case it must be shown that defendant "placed plaintiff () in a more vulnerable position than he would have been had (defendant) never taken any action at all"]). As Chief Judge Cardozo further explained, "[t]he distinction in such cases is the old one between nonfeasance and misfeasance" (Marks, 245 NY at 258).
But in analyzing whether Eros and TRYP assumed a duty, the majority improperly interjects performance of a duty and proximate cause within that analysis, which are entirely distinct legal conceptions. Whether Eros and TRYP assumed a duty to call the police immediately has nothing to do with whether "their actions affirmatively place[d Dr. Beadell] in a more vulnerable position than he was when they undertook to act" (majority opinion at 11). That concern goes to negligence, not the existence of an assumed duty in the first place. The Restatement puts it clearly:[FN2]
"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's [*9]person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking."
Restatement (Second) of Torts § 323 (1965)[FN3]. An undertaking is when one chooses "gratuitously or for consideration, to render services to another," but liability does not flow from such an undertaking unless the actor fails to exercise reasonable care and thereby (a) increases the risk of harm or (b) reliance on the actor's undertaking causes harm (id.). Assumption of a duty, performance of a duty, and that performance's impact on an individual, are all distinct questions that go to liability (see e.g. Nallan, 50 NY2d at 522 [holding that to find an assumed duty "would require plaintiffs to show not only that defendant () undertook (a duty) and did so negligently, but also that its conduct in undertaking the (duty) somehow placed plaintiff ( ) in a more [*10]vulnerable position than he would have been in had (defendant) never taken any action at all"]). The majority conflates all three, relying on the improper bundle to conclude no duty exists as a matter of law.
Here, Eros and TRYP assumed a duty to call 911 and to relay that Dr. Beadell's sister, a medical professional, asked that he be placed on a 72-hour psychiatric hold. Those facts are sufficient to establish the voluntary assumption of a duty, and to define its scope. The majority's reliance on contentions that Dr. Beadell "did not give defendants control over his person," that Eros and TRYP's actions did not "place him in a more vulnerable position than he was when they undertook to act," and that "it was [not] reasonably foreseeable that [plaintiffs] would forgo other efforts to summon aid in reliance on defendants' promise to call 911" (majority op at 11), have absolutely nothing to do with duty: they go to whether Eros and TRYP acted negligently and whether their actions were a proximate cause of Dr. Beadell's death [FN4]. The majority's analysis puts the cart before the horse, and considers factors completely irrelevant to the simple question of whether defendants voluntarily undertook an affirmative action on behalf of plaintiffs.B.
The duty plaintiffs ask the Court to evaluate is not a general one that applies to all hotels or all persons who learn that someone is suicidal. Instead, it is a duty voluntarily assumed by Eros and TRYP to contact the police immediately in an emergency [FN5]. They voluntarily undertook such a duty—not once, but twice. At 7:12 P.M., Ms. Anderson called the hotel demanding they call the police immediately and request they put Dr. Beadell on a 72-hour psychiatric hold. The hotel staff undertook to contact the police immediately. They didn't. Instead, around 7:25 P.M., the hotel called Ms. Anderson to ask whether she was sure they wanted the police involved. Ms. Anderson vociferously demanded they contact the police. The hotel staff again assured her they would call the police immediately.
The majority concedes that there may be some cases in which an assumed duty could arise "where a hotel undertakes to obtain timely medical or emergency assistance for a guest," and that it might have been "a closer question here if hotel staff had actively discouraged Dr. Beadell's family members from attempting to obtain help themselves" (majority op at 13). That observation again confuses negligence and proximate cause with the existence of a duty. Moreover, if the circumstances in this case do not warrant holding there was an assumed duty to contact the police immediately, it is hard to imagine real-world circumstances in which a duty would exist under the majority's reasoning. If a mother called the front desk from her room and pleaded that the hotel call EMS immediately because her infant son was in anaphylactic shock, and the hotel promised but failed to do so, and the son later died, would that be enough for the majority to find a duty was assumed? If someone called a hotel and requested that it call the police immediately because they knew that their cousin, a guest, had a bomb in his room that he intended to detonate, and the hotel agreed but failed to do so, would the majority find a duty had been assumed only if [*11]the hotel had told the cousin not to call the police himself? I mention these hypothetical hotels' delays, the son dying, and the bomb going off purely to expose the unsoundness of the majority's rationale. In the examples involving anaphylactic shock or a bomb, the difference does not lie in the assumption of a duty, but rather in the degree to which proximate cause would be contestable. But that difference in proximate cause does not work its way into determining whether someone has assumed a duty. All that matters in Dr. Beadell's case, and in each of these examples, is that the hotel promised to immediately the call police in a situation it knew to be an emergency, and thereby assumed a duty.C.
On policy grounds, that duty, consistent with this New York's long line of assumed duty law, is exactly the type this Court should endorse (see e.g. Marks, 245 NY at 258 [holding a landlord voluntarily assumed a duty to make repairs]; Florence v Goldberg, 44 NY2d 189, 192 [1978] [holding a city, through its police department, voluntarily assumed a duty to supervise school crossings]). To recognize an assumed duty in these circumstances would not "create a specter of liability that discourages rather than encourages hotels from offering assistance to guests contemplating suicide" (majority op at 13). On the contrary, endorsing such a duty would incentivize hotels to act reasonably by calling the police promptly, as requested and as promised, a path by which they can equally avoid liability. The majority's public policy argument exists in a world in which, if a hotel is asked to call the police in an emergency—whether a child in shock, a bomb or a suicidal guest—the hotel will say, "sorry, we don't want to be liable, call yourself." It also assumes that guests will want to stay in hotels that avoid liability by being as unhelpful as possible, rather than in ones that not just undertake to assist but actually make good on their promises.
Moreover, the factors the majority states a court must examine to determine the "existence and scope of a tortfeasor's duty" on policy grounds are irrelevant to the assumed duty landscape (majority op at 12). Yes, if the question before us were whether it was mandatory that a hotel call the police immediately whenever they are asked to, rather than whether a hotel has assumed a duty to call the police immediately once they have already agreed to, we should consider "balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability" in order to "apportion[] risks and allocate[] the burden of loss" (majority op at 12-13 [quoting Moore Charitable Found. v PJT Partners, Inc., 40 NY3d 150, 160-161 (2023) (internal quotation marks and citations omitted)]). In the case of an assumed duty, the court is not the arbiter of what new duty should be recognized, the undertaker is.
The majority's decision encourages hotels, or for that matter any similar service provider, to agree they will contact the police immediately in an emergency, and lackadaisically do so only whenever it suits, potentially harming the lives of those who needed that instant emergency assistance, just as in Dr. Beadell's case. The majority breaks with a century's worth of precedent, and signals that "[w]here a party voluntarily assumes the performance of a duty" he is no longer "required to perform it carefully," or rather, to perform it at all (Marks, 245 NY at 258).III.
To be entitled to summary judgment, Eros and TRYP must also demonstrate (1) that no reasonable jury could find that they were negligent in failing to call the police immediately; and (2) that no reasonable jury could find that their inaction was a proximate cause of Dr. Beadell's death. These are closer questions than whether Eros and TRYP assumed a duty, but despite—or really, because of—their factual complexity, they are questions for the jury, not the court (see e.g., Andre v Pomeroy, 35 NY2d 361, 364 [1974] [noting that "whether the defendant or the plaintiff acted reasonably under the circumstances. . . . can rarely be decided as a matter of law"]; Derdiarian v Felix Contr. Corp., 51 NY2d 308, 312 [1980] ["(a)s a general rule, the question of proximate cause is to be decided by the finder of fact, aided by appropriate instructions"]).[*12]A.
The negligent performance of a duty is "broadly and generally speaking, [] the failure to employ reasonable care—the care which the law's reasonably prudent [person] should use under the circumstances of a particular case" (McLean v Triboro Coach Corp., 302 NY 49, 51 [1950]). Here, Eros and TRYP did not merely undertake a duty to call the police eventually, but a duty to do so immediately. Immediate is "[o]ccurring without delay" or "instant" (Black's Law Dictionary [12th ed. 2024]). They were also fully aware that the emergency was a potential suicide. The TRYP employees did not call the police until 7:37 P.M., 25 minutes after initially assuring Ms. Anderson they would do so immediately, and 11 minutes after promising to do so a second time, in response to her incredulous and desperate demand upon learning that the hotel had not already done so. Those facts reveal not only a duty twice assumed, but what a jury could find to be a duty unreasonably twice delayed, and therefore twice breached. As Justice Holmes once explained "what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not" (Texas & P. Ry. Co. v Behymer, 189 US 468, 470 [1903]). Based on the facts in the record, a jury could reasonably conclude that Eros and TRYP did not act with reasonable prudence under the circumstances. Or, at trial, Eros and TRYP may present evidence explaining why the lapse of time was reasonable under the circumstances. But there is nothing in the record to allow us to conclude, as a matter of law, that Eros and TRYP acted as a reasonable person would.B.
When opposing a defendant's motion for summary judgment, "a plaintiff need not prove proximate cause by a preponderance of the evidence, which is plaintiff's burden at trial. Instead, to withstand summary judgment, a plaintiff need only raise a triable issue of fact regarding whether defendant's conduct proximately caused plaintiff's injuries" (Scurry v New York City Hous. Auth., 39 NY3d 443, 453 [2023] [internal citations omitted]). "[A] 'defendant's negligence qualifies as a proximate cause where it is 'a substantial cause of the events which produced the injury' " (Hain v Jamison, 28 NY3d 524, 528-529 [2016] [quoting Mazella v Beals, 27 NY3d 694, 706 (2016)]).
"Typically, the question of whether a particular act of negligence is a substantial cause of the plaintiff's injuries is one to be made by the factfinder" (Hain, 28 NY3d at 529 [internal citations omitted]; see also Scurry, 39 NY3d at 454 ["(g)iven the unique nature of the inquiry in each case, proximate cause is generally an issue for the trier of fact, so long as the court has been satisfied that a prima facie case has been established and the evidence could support various reasonable inferences"]; Newman v RCPI Landmark Properties, LLC, 28 NY3d 1032, 1033 [2016] ["Questions regarding proximate cause generally are for a trier of fact"]; Nowlin v City of New York, 81 NY2d 81, 89 [1993] ["Proximate cause is a jury question"]). Proximate cause may be decided as a matter of law when only "one conclusion may be draw from the established facts" (Hain, 28 NY3d at 529), and not when the evidence could support several reasonable inferences.
To evaluate proximate cause, I now have to consider most of the analysis the majority mistakenly mixes into its analysis of duty. The issue with causation is "not what defendant could have prevented but what defendant proximately caused by inducing reliance" and "whether defendant's conduct placed plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing" (Heard v City of New York, 82 NY2d 66, 72 [1993]). Moreover, proximate cause generally "turns upon questions of foreseeability and what is foreseeable and what is normal may be the subject of varying inferences" (Hain, 28 NY3d at 529 [internal citations omitted]).
Our Court has not decided cases concerning proximate cause in the context of suicide. However, the Appellate Division, in Ferrer v Riverbay Corp. has held that the issue of whether a suicide was foreseeable is a question for the jury (see Ferrer v Riverbay Corp., 214 AD2d 312 [1st Dept 1995]). That holding comports with our general law on proximate cause as a jury issue dependent on the facts. In Ferrer, officers learned that 12-year-old girl had just been sexually assaulted, isolated her from her friends, refused to let her to call her mom, and pushed her to agree to press charges against her assailants; she was then left [*13]unattended, climbed out a window balcony and committed suicide (id.). If a court found there was a basis to foresee a suicide when the plaintiff had just experienced a traumatic event, there must be a basis for a jury to find a suicide was foreseeable when the hotel has been notified that Dr. Beadell is vocalizing suicidal ideations, has been standing on a ledge, is known by the hotel to have liquor bottles and pills strewn around his room, and has been contacted by his sister, a mental health professional, informing them of his mental health history and demanding that they ask the police to put him on a 72-hour psychiatric hold.
Second, both Dr. Beadell's wife and sister testified that they did not call the police because they relied on the hotel staff's assertions that they had already done so or were doing so. When directly asked why she did not call the police, Ms. Anderson stated "I relied on the fact that the manager said that she would contact the police." Ms. Greeninger similarly stated she did not call because Ms. Anderson "had informed me that the police had already been called and were on their way." Among other facts the jury could consider is that in an emergency situation Mr. Beadell's family, located in Nebraska and Minnesota, might have reasonably concluded that the best chance of a quick intervention was calling the hotel instead of searching to determine what precinct in New York was the appropriate one to call. The majority states that "plaintiffs failed to raise a material question of fact as to whether it was reasonably foreseeable that they would forgo other efforts to summon aid in reliance on defendants promise to call 911" and that "[e]ven if plaintiffs could rely on the hotel's representations that there would be a call to 911, it was not reasonable for the family to expect that any such call would be made with the desired immediacy" (majority op at 12).
Hold on a minute. In a panic, you call a hotel a couple of thousand miles away, saying that your husband or brother is suicidal, has a history of suicide, sent a photo of himself on a ledge to you, and you frantically demand the hotel call 911, and the hotel assures you it will do so. Then, the majority's words pop into your head: "It [is] not reasonable for [me] to expect that any such call would be made with the desired immediacy" (majority op at 11-12). Even if that sounds remotely credible to you, in any event, the testimony of Dr. Beadell's family, and the reasonableness or foreseeability of their reliance, is not for our Court to evaluate. If credited by the jury, Ms. Greeninger and Ms. Anderson's testimony provides a basis to find that they relied on Eros and TRYP's promise to call the police immediately, as requested. There are also facts in the record by which the jury could find that this reliance was foreseeable, including Ms. Greeninger and Ms. Anderson's repeated calls to the hotel asking for updates, Ms. Anderson's expressed anger during one of those calls when she learned that the hotel had not yet contacted the police as promised, and Ms. Anderson's continued adamancy that the hotel contact the police immediately. Why repeatedly ask for help in an emergency if you are not relying on it? Upon deciding that plaintiffs' reliance was both reasonable and foreseeable, a jury could further find that the hotel's delays resulted in the police getting to Dr. Beadell later than otherwise would have, thus narrowing any opportunity to prevent Dr. Beadell's death.
Third, plaintiffs raise triable issues of fact by way of three expert affidavits, two of whom focused on how the delay in calling 911 contributed to an inability to prevent Dr. Beadell's suicide, and are worthy of discussion here. Steven Fayer, M.D., a board-certified psychologist and neurologist practicing since 1974, testified to how Dr. Beadell had been successfully prevented from committing suicide in the past, how Dr. Beadell was not set on suicide given he had been weighing it for over an hour while he communicated with family, and how alcohol consumption further increases the risk as time passes. Hugh McGowan, a 33-year veteran of the NYPD with expertise in police intervention practices, testified that if police had been notified in a timely fashion, Dr. Beadell would have been safely in his room, and not on the ledge, and that the elapsed time due to defendants' delay greatly diminished the opportunity to dissuade Dr. Beadell from committing suicide. An expert's view "may be deemed sufficiently probative to defeat summary judgment if it makes reference to outside material" or if "the nature of the subject matter or the expert's area of special skill will suffice to support the inference that the opinion is based on knowledge acquired through personal professional experience" (Romano v Stanley, 90 NY2d 444, 452 [1997]). Here, plaintiffs' experts' [*14]testimony is not speculative, as the defendants allege and as the Appellate Division found, but based on professional experience and tied to the record.
Of course, no expert can opine that someone would not have committed suicide if things had been different. But the lack of absolute certainty is true with regard to most admissible expert testimony, and in tort cases absolute certainty of causation is not required because there can be more than one proximate cause of a decedent's death or injury (see e.g. Sweet v Perkins, 196 NY 482, 485 [1909] ["There may be more than one proximate cause of an accident"]). The testimony provided by Dr. Frayer, in particular, is no different from typical expert testimony on which New York courts regularly rely to find that a non-movant's case survives summary judgment, so that the jury can hear cross-examination and sort out probabilities for themselves (see e.g. Brown v State, 31 NY3d 514, 520 [2018] [declining to hold that proximate cause was lacking as a matter of law when plaintiff's expert failed to prove that but for defendant's dangerous condition her injuries would not have occurred]; Butler v City of Gloversville, 12 NY3d 902 [2009] [holding that a plaintiff's claim—that defendants' failure to use a certain ground cover was the cause of her injury after falling off a playground slide—presents a genuine issue of fact in light of conflicting expert testimony on the adequacy of the ground covers]; Cornbrooks v Terminal Barber Shops, 282 NY 217, 223 [1940] [declining to holding that plaintiff's claim—that the loss of sight in one eye because of a barber's negligent operation of a buzzer—failed as a matter of law when plaintiff's expert testimony regarding likely the cause was disputed by defendants]). This is even so in the event of delayed treatment or action (see e.g. Gachette v Leak, 172 AD3d 1327, 1330 [2d Dept 2019] [determining that plaintiff's expert raised triable issues of fact as to whether a doctor's delays were the proximate cause of his injuries]; Breland v Jamaica Hosp. Med. Ctr., 49 AD3d 789, 790 [2d Dept 2008] [same]), as well as in negligence or wrongful death suits brought in the case of suicide (see e.g. Tkacheff v Roberts, 147 AD3d 1271, 1275 [3d Dept 2017] [holding that plaintiff's expert psychiatrist detailed opinion raised genuine issue of fact as to whether decedent's psychiatric nurse practitioner departed from the standard of care]; Thomas v Reddy, 86 AD3d 602, 604 [2d Dept 2011] [holding that plaintiff's expert affidavit "raised a triable issue of fact as to whether the (defendants) exercised something less than professional judgment in deciding to discharge the decedent" who later committed suicide]).[FN6]
Finally, even common knowledge can evince the idea that suicide is often impulsive, and that time is an invaluable tool in suicide prevention. A recent public health campaign and research initiative at Harvard indicates that up to 1 in 4 survivors of nearly-lethal suicide attempts deliberated for less than five minutes before deciding to act (Harvard T.H. Chan School of Public Health, Means Matter: Duration of Suicidal Crisis, https://hsph.harvard.edu/research/means-matter/means-matter-basics/duration-of-suicidal-crises/ [last accessed January 21, 2026]; see also Eberhard A. Deisenhammer et al., The duration of the suicidal process: how much time is left for intervention between consideration and accomplishment of a suicide attempt? The Journal of Clinical Psychiatry, 70 [1], 19-24 [2009] [noting that nearly 50% of patients in a study of attempted suicide survivors reported a period of 10 minutes or less between suicide contemplation and attempt]). Similarly, a years' long evaluation of suicide crisis hotlines revealed that suicidality decreased significantly during the course of a phone call with a hotline (see Madelyn S Gould et al., An evolution of crisis hotline outcomes, Part 2: Suicidal callers, Suicide and Life-Threatening Behavior, 37 [3], 338-52 [2007]). Moreover, the average person can appreciate that time allows the effects drugs and alcohol to worsen, as well as any associated impairment, and that this might have played a heightened factor in Dr. Beadell's suicide because of any delays.
Altogether, plaintiffs provided sufficient evidence to support a valid line of reasoning that Eros and TRYP's delays in contacting the police diminished the opportunity to prevent Dr. Beadell's suicide (see Heard, 82 NY2d at 72 [noting that when the evidence "provide(s) any valid line of reasoning and permissible inferences that could lead rational minds to the conclusion urged by plaintiff," the issue of causality should be left to as a factual matter for the jury]). The Appellate Division placed a legally incorrect burden of proof on the plaintiffs. It held that "plaintiffs' proximate cause argument necessarily fails because it is just as reasonable that Dr. Beadell's suicide was caused by the 30-minute period after the police were called by defendant, and any finding to the contrary would be mere speculation" (229 AD3d 43, 62 [1st Dept 2024]). But by that logic, plaintiff's proximate cause argument necessarily succeeds as a matter of law. Competing inferences which are "just as reasonable" to have caused Dr. Beadell's death are exactly the type of questions a court must sent to the jury. To decide proximate cause as a matter of law is a drastic judicial remedy meant for circumstances in which reasonable minds can reach only one conclusion. This case is not those circumstances, even by the Appellate Division's own words.* * *
Dr. Beadell's suicide was grievous, made more so by today's decision. In declining to find that Eros and TRYP assumed a duty to call the police, the majority rejects longstanding precedent and, put bluntly, insulates catastrophic lies from liability. We cannot know with certainty what would have happened had the hotel called 911 immediately, as they promised to do. The problem is holding that what could have happened does not matter. Instead, we should hold that a jury should hear the evidence and have a chance to decide whether Eros and TRYP acted as a reasonable person would, and if they did not do so, whether that was a proximate cause of Dr. Beadell's death. Although many things in the law—indeed, maybe everything—cannot be proven to an absolute certainty, to avoid summary judgment the facts, taken in the light most favorable to the plaintiffs here, need only provide a reasonable basis for a jury to conclude that Dr. Beadell's fate may have been different if the hotel had called the police next door, 25 minutes earlier. Plaintiffs have provided that basis.
Order insofar as appealed from affirmed, with costs. Opinion by Judge Cannataro. Judges Rivera, Garcia, Singas, Troutman and Halligan concur. Chief Judge Wilson dissents in an opinion.
Decided February 19, 2026

Footnotes

Footnote 1: Decedent's family members were aware of his mental health history, including a prior suicide attempt.
Footnote 2: All times are in Eastern Daylight Time.
Footnote 3: Decedent's blood alcohol content at his autopsy was 0.36%.
Footnote 4: Plaintiffs initially commenced this action in October 2017, naming Eros, Wyndham Hotel Management, Inc. and Christian Aldoy as defendants. In May 2020, following discovery, plaintiffs commenced a second action against TRYP Management, HCS Hospitality Inc. and Ronica Sharma. Supreme Court consolidated the two actions. In September 2021, the parties stipulated to discontinue the action against HCS and Sharma with prejudice. Supreme Court granted defendants Wyndham and Aldoy summary judgment dismissing the complaint as against them.
Footnote 5: As pleaded, the theories of liability are somewhat unclear, as the allegations in support of the negligence and wrongful death causes of action are imprecise as to whom any alleged duty was owed and what injuries flowed from the breach of those duties. Indeed, although this is not a special duty case, it is framed very similarly, in terms of the assumption of a duty to act on behalf of an injured party, direct contact with a family member of the injured party and justifiable reliance (see e.g. Maldovan v County of Erie, 39 NY3d 166, 172-174 [2022]).
Footnote 6: The dissent relies on the Restatement (Second) of Torts § 323 (1965) instead of the Restatement (Third) of Torts § 42 (2012). But the substantially similar language of section 323 is consistent with our approach limiting the scope of duty by examining the reasonableness of the claimed reliance: "One who undertakes, gratuitously or for consideration, to render services to another" assumes a duty, and thus is "subject to liability to the other for physical harm resulting from [their] failure to exercise reasonable care to perform [their] undertaking," if either the "failure to exercise such care increases the risk of such harm" or "the harm is suffered because of the other's reliance upon the undertaking" (Restatement [Second] of Torts § 323 [1965]). We believe the issue is properly resolved under the circumstances of this case by determining the scope of the duty assumed, although we acknowledge that another way to look at it would be to analyze whether defendants breached the assumed duty. We would reach the same result under either analysis.
Footnote 1: For present purposes, I treat Eros and TRYP together, although it may be that, for reasons having to do with corporate structure or otherwise, only one of the two could be held liable here. No such issue is before us on this appeal.
Footnote 2: Although I cite to the Restatement (Second) of Torts § 323, the general assumed duty standard, Restatement (Second) of Torts § 324 provides an alternative assumed duty standard also applicable here, because there are facts that, if taken in the light most favorable to the nonmoving party (plaintiffs), would support a determination that Eros and TRYP took charge of Dr. Beadell when he was demonstrably unable to help himself. Restatement (Second) of Torts § 324 (1965) states:
"One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by

(a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or

(b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him."

Restatement (Second) of Torts § 324, just like § 323, separates the actual assumption of a duty from reliance and causation, unlike the majority's analysis. What differs is that Restatement (Second) of Torts § 324 applies in the case where an individual "takes charge of another is helpless."
Footnote 3: The majority relies on the Restatement (Third) of Torts. But legal scholars often question whether the Third Restatement of Torts is more hortatory than descriptive of current law (see, e.g. Cristina Carmody Tilley, Tort Law Inside Out, 126 Yale LJ 1320, 1338-1340 [2017] [explaining the article's reliance on the Restatement (Second) of Torts, rather than the Restatement (Third) of Torts, for a variety of reasons, including that "the Restatement (Third) was promulgated during a period of increasing politicization of torts generally and the ALI process tangentially" and has been critiqued as subject to the influence of various interest groups]; cf. Kansas v Nebraska, 574 US 445, 475 [2015] [Scalia, J., concurring and dissenting in part] [noting the view that the modern Restatements do not "describ(e) the law" but "instead to set forth their aspirations for what the law ought to be"] [citations omitted]; Christopher E. Appel, The American Law Institute's Impending Credibility Crisis: A Review of Modern Restatements of the Law, 36 U Fla JL & Pub Pol'y 119, 129-132 [2025] [noting that portions of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm have been characterized as being created "to address dissatisfaction with the existing common law rules," unlike the Restatement (Second) of Tort's grounding in existing case law]). Other than citing to the Restatement (Third) of Torts and its associated comments, the majority cites only to non-New York cases to support its proposition that reliance and proximate cause are analyzed within duty (see majority op at 8-9). The majority's reliance on these authorities further demonstrates that New York law on the question at issue is consistent with the Second Restatement, not the Third.More importantly, the majority's reliance on the Third Restatement to justify the contraction of an assumed duty is unfaithful to the underlying goals of that Restatement's reformation of the negligence doctrine. "The Restatement (Third) Reporters believe[d] . . . that courts sometimes usurp the jury's function of determining breach by mischaracterizing a breach issue as a duty issue and then claiming the prerogative to decide the duty issue as a matter of law" (Benjamin C. Zipursky, Foreseeability in Breach, Duty, and Proximate Cause, 44 Wake Forest L Rev 1247, 1251 [2009]). Accordingly, the Restatement (Third) of Torts removes foreseeability from duty with the intent to reinforce that "the jury, not the judge, is entitled to make a decision as to whether the degree of foreseeability was so low that there is no liability" (id.). In fact, Comment d. of Restatement (Third) of Torts § 42 (2012) states that "[w]hile knowledge that the undertaking will reduce the risk of harm to another is necessary for the existence of an undertaking, knowledge that the other will rely on the undertaking is not. When underlying facts are in dispute, the question of whether a duty exists must be submitted to the factfinder with appropriate alternative instructions." Contrary to the objectives of the Third Restatement, the majority concludes that no duty existed because it was not reasonably foreseeable that the plaintiffs would rely on the defendant's promise to call 911 or that said call would happen with the plaintiffs' desired immediacy (majority op at 12).
Footnote 4: The majority incorrectly analogizes this case to a special duty case (majority op at 4). But special duty claims apply only to governmental entities (see Maldovan v County of Erie, 39 NY3d 166, 171 [2022]). "The special duty rule is based on the rationale that exposing municipalities to tort liability may 'render them less, not more, effective in protecting their citizens' " (id. at 174 [quoting McLean v City of New York, 12 NY3d 194, 203 [2009]). In other words, the additional hoops plaintiffs must jump through to prove that a duty even exists in special duty cases are meant to help insulate municipalities from liability, and derive from governmental immunity. The majority, in stating this case "is framed very similarly" to a special duty case, effectively elevates Eros and the TRYP hotel to the status of government entities. Indeed, by analogizing private hotels to governmental entities, the majority exposes the weakness of its position: but for the governmental immunity underlying the special duty rule, municipalities would be liable for exactly the conduct alleged here.
Footnote 5: Although each of the defendants in these cases have medical expertise, I cite to them not for the premise that Eros and TRYP were obliged to make any medical determinations. I cite to them for the premise that an expert opinion can, and often does, form the basis of a triable issue in cases like this one.